7640

DIXON v. CHIQUOLA MANUFACTURING CO.

MASTER AND SERVANT.—BURDEN is on master to prove he could not discover latent dangers in instrumentalities by exercise of due diligence. Where a servant is in the habit of performing the work at which he is injured, he is not to be considered a mere volunteer. Where the master fails to inspect steam pipes and a servant, who has been turning on the steam with knowledge of the master, attempts to turn it on and is scalded because of failure to inspect, the master is liable.

Before SHIPP, J., Anderson, February, 1909.    Reversed.

Action by C. W. Dixon against Chiquola Manufacturing Co. From order of nonsuit, plaintiff appeals.

*Messrs. Tillman & Watson* and *Paget & Watkins,* for appellant. *Messrs. Tillman & Watson* cite: *Assumption of risks, not pleaded, cannot be relied on by defendant:* 73 S. C., 503. *Servant is not bound to know of latent defect:* 72 S. C., 411. *What is scope of employment here?* 26 Cyc., 1090. *Rule not used becomes abrogated:* 42 S. E., 913; 139 N. C., 528; 68 S. C., 55. *Duty of inspection:* 68 S. C., 55; 72 S. C., 264; 66 S. C., 302; 14 S. E., 367; 26 Cyc., 1277; 15 S. C., 443; 65 S. C., 192; 18 S. C., 275; 66 S. C., 482; 71 S. C., 79; 72 S. C., 411.

*Mr. Wm. G. Sirrine, Bonham, Watkins & Allen,* contra, cite: *As applicable to the case:* 72 S. C., 398; 69 S. C., 529; 72 S. C., 237, 264.

July 27, 1910. The opinion of the Court was delivered by

Mr. Justice Gary. This is an action for damages alleged to have been sustained by the plaintiff through the negligence of the defendant.

The allegations of the complaint, material to the questions involved, are as follows:

"That at the times hereinafter mentioned plaintiff was working in the weave room of the defendant, which is situated on the first floor of its cotton mill. Defendant had installed in this room a system of pipes, which connect with the boiler and which distribute steam over the said room, when the humidifiers need assistance, to preserve the proper humidity and temperature. There is a main pipe running from the boiler room, which enters the weave room through the wall of the mill. This main pipe runs along the side of the wall, parallel with the floor of the weave room, and, at different places, pipes have been joined to the main pipe, which are perpendicular thereto, and which run up the walls of the mill some five or six feet and are equipped at the end with a mouth, through which the steam comes into the weave room. Also connecting with this main pipe is a drain pipe, which runs through the wall of the mill into the open air, and which drains the water from the condensed steam out of the main pipe. There is a valve at the point where the main pipe enters the weave room, and each of the perpendicular pipes have valves to regulate the influx of steam from the boiler into the room.

"On February 3, 1908, plaintiff went to his work in the mill, as usual. The weather was very cold, and had been for several days previous. About nine o'clock that morning plaintiff, feeling that the room needed steam to bring about

the proper humidity and temperature, so that the work of weaving could be properly done, went to one of these perpendicular pipes. Plaintiff, and the other weavers, had been accustomed to turn the valves to these pipes when it was necessary, all of which was well known to defendant, its agents and servants. Plaintiff turned this valve to let in more steam, and, instead of steam coming out of the pipe, hot water poured out on plaintiff and injured him.

"Plaintiff is informed, and believes, that the direct and proximate cause of his injury was as follows: The cold weather had caused the drain pipe to freeze up, and there was no way for the water from the condensed steam to find an outlet, and, as a consequence, hot water had collected in the main pipe, and when the valve was opened, which controlled the perpendicular pipe, this water was forced out and scalded plaintiff. Plaintiff further alleges, on information and belief, that the defendant, its agents and servants, had failed to inspect the drain pipe, as was its duty. * * *."

The defendant denied the allegations of negligence, and set up as a defense that plaintiff's injury was caused by his own negligence; and in that connection alleged, that "on the day that plaintiff is alleged to have been injured the overseer in charge of the room had caused steam to be turned in said pipes before the mill began work for the day, but, finding one of the drain pipes clogged by ice, had turned off said steam, and while working at the drain pipe from the outside of the mill, defendant is informed and believes that plaintiff, without authority, went to the main valve, which controlled the movement of steam into the said system of pipe, and opened the same, allowing steam to flow into the same from the boiler room, thereby not only acting in violation of orders, but endangering said overseer."

The defendant also interposed the defense of contributory negligence.

At the conclusion of the testimony for the plaintiff a motion for nonsuit was made by the defendant's counsel, upon the following grounds:

1. "There is no testimony showing that the defendant was guilty of any wanton, reckless or wilful negligence.

2. "The testimony permits of but one inference, to wit, that plaintiff was injured by his own negligence.

3. "The plaintiff testifies that he was in the habit of turning on the steam, and knew that water would come out with the steam if the outlet pipe was frozen. He made no effort of inquiry, he says, to ascertain whether the outlet was frozen or not, though he knew it was freezing weather and it could be reasonably anticipated that the pipe would freeze. He, therefore, assumed the risks incident to his employment.

4. "There is no testimony tending to show that the appliances were defective, or not properly constructed; or that the injury was due to the freezing of the pipe.

5. "There is no evidence showing that defendant was guilty of any negligence which was a proximate cause of the injury.

6. "The testimony tends to show that it was no part of plaintiff's duty to turn on the steam, and for his voluntary act, done without defendant's knowledge, defendant is not responsible."

His Honor, the presiding Judge, granted the following order:

"Upon hearing the motion for a nonsuit in the above entitled case, and after argument, it is ordered:

"That the motion be granted on the first ground, to wit: That there is no testimony tending to show wanton or wilful negligence on the part of the defendant.

"As to the other grounds: There is no testimony showing that it was the duty of plaintiff to open the valve in the steam pipe, nor that he was directed to do so by any agent or officer of the defendant company having authority to

give him orders. He opened the valve voluntarily and without the knowledge or permission of defendant, and there was no obligation on its part to warn him of a danger of which he was fully cognizant and which he assumed.

"It is further ordered, that the motion for nonsuit as stated in defendant's second ground for said motion be, and the same is hereby, granted."

The plaintiff did not appeal from the order of nonsuit, as to the cause of action for punitive damages.

The practical question presented by the exceptions is, whether there was error on the part of his Honor, the presiding Judge, in granting the order of nonsuit as to the cause of action for compensatory damages, on the second ground, which was as follows: "The testimony permits of but one inference, to wit, that plaintiff was injured by his own negligence." The reasons assigned by the presiding Judge for this conclusion are stated in his order, one of which, viz.: that the plaintiff assumed the risk was neither set up as a defense, nor made a ground of the motion for nonsuit.

The plaintiff testified as follows:

"I believe you stated that you had been accustomed, as a weaver, to turn that steam into the room? Yes, sir. How about cutting it off? Yes, sir; I would cut it off, too, and the other weavers had to work it all of the time. They had been at it all of the time? Yes, sir. What bosses were above you in that room, and what were they called? The overseer and Mr. Beacham, and Mr. Snipes, the second hand. They were both over you? Yes, sir; Mr. Snipes was the second hand on the lower department. Had they ever seen you turn that steam into the room, and cut it off? Yes, sir. How many times? I couldn't say; I had been accustomed to turning it on ever since I had been there. How long had you been weaving at that mill, altogether? I had been working there three years, or a little over. Had you been warned or forbidden to turn them on and off?

No, sir. Not a single time? No, sir; I never had. Had you ever been told to do it? I had been told by Jim Holder. He was a second hand, and he had charge of one hundred looms that he kept repaired when they would get out of fix, and I had complained about the weaver between me and the wall having it cut off, and he told me time and again to turn it on whenever I needed it, and he said he guessed I could turn it on as fast as he could cut it off. Who was he? He was a second hand; he kept the looms fixed. He had some authority as second hand; he was not the overseer, but had some authority over the help? Yes, sir. Was there any man particularly whose duty it was to turn the steam off and on in the pipes? No, sir; if there was, I never heard of it. Did you say you had a conversation with Mr. Beacham about your accident there? Yes, sir; I did the morning he come to my house. How long after the accident? I don't know, sir; but I think it was about the first of April. What was it you did tell him? He asked me about how it occurred, and he went on to say that I would not have got scalded if the steam pipe had not been frozen; that he had not inspected them that morning, and that he had not had time; and said he was accustomed to inspecting the pipes on cold mornings that way, but that morning he had not had time."

On cross-examination he thus testified:

"It was your duty to turn on that steam that morning? Yes, sir; we had been doing it. It was as much your duty to look after that pipe as any one's? Yes, sir. Had you had orders to turn it on? I had by Jim Holder, the second hand. And you did it without any inspection, didn't you? I couldn't inspect the pipe; I would had to have gone outside of the mill to inspect it. Why didn't you get out and see if it was frozen? That was not my duty, and they didn't allow hands to go out of the mill. When you were uncertain about your duty you would ask the superior, the overseer? Yes, sir. Why didn't you do it in this instance?

Well, I had been accustomed to turning it on,. the pipe, and there was no danger before, and I didn't think of any danger. And the reason you didn't inspect it, and didn't ask any one anything about it, you thought there was no danger? No, sir; I didn't think there was any danger."

The law imputes to the master knowledge of latent danger in his instrumentalities, and casts upon him the burden of proving that he could not have discovered the danger by the exercise of due diligence. *Wood* v. *Mfg. Co.,* 66 S. C., 482; *Roach* v. *Mining Co.,* 71 S. C., 79, 50 S. E., 543; *Gunter* v. *Mfg. Co.,* 15 S. C., 443; *Lasure* v. *Mfg. Co.,* 18 S. C., 275; *Jennings* v. *Mfg. Co.,* 72 S. C., 411, 52 S. E., 113; *Green* v. *Ry.,* 72 S. C., 398, 52 S. C., 45.

"The scope of a servant's duties is to be defined by what he was employed to perform, and by what, with the knowledge and approval of his master, he actually did perform, rather than by the mere verbal designation of his position; and where it is shown that the servants were in the habit of performing the work at which plaintiff was injured, he is not to be considered a mere volunteer." 26 Cyc., 1090.

Applying these principles to the foregoing testimony, it clearly appears that the exceptions raising this question must be sustained.

It is the judgment of this Court that the judgment of the Circuit Court be reversed (except as to the cause of action for punitive damages), and that the case be remanded to that Court for a new trial.

MR. JUSTICE WOODS. In concurring in the opinion of Mr. Justice Gary it seems important to notice one position, relied on by the respondent, which is not referred to in the opinion. That position is that the evidence of the plaintiff gives no ground to infer that the unexpected escape of the hot water from the pipe, by which the plaintiff was injured,. was due to the negligence of the defendant. If this were so, then the case would be one where, nothing being proved

beyond an injury resulting from failure of an instrumentality in ordinary use, negligence of the master could not be inferred.   *Green* v. *Southern Ry.*, 72 S. C., 398; *Gentry* v. *Southern Ry.*, 66 S. C., 256; *Edgens* v. *Gaffney Mfg. Co.*, 69 S. C., 529.   But the principle of these cases does not apply, for there was evidence that the condensation of the steam into hot water would have been discovered by proper inspection, and that there was no inspection.