130

## 12322

### DAVIS, ADMINISTRATOR, v. ATLANTIC COAST LINE RAILROAD COMPANY *ET AL.*

(147 S. E., 884)

ORDER FILED APRIL 13, 1929

131

132

*Messrs. Henry E. Davis, Raysor, Moss & Lide,* and *Douglas McKay,* for appellants,

*Messrs. Wolfe & Berry* and *A. H. Moss,* for respondent,

November 17, 1927.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This action was commenced on October 4, 1922, to recover damages for the alleged wrongful death of W. Baylor Richards, who was employed as a flagman by the defendant railroad company at the time of his death. Some time before Richards was killed, the defendant railroad company had employed Williams Bros. Construction Company as an independent contractor, to fill in a trestle on one of the lines of the defendant railroad company. In carrying on this work, the construction company used a steam shovel, and to understand this case it is necessary to know something of the steam shovel and its operation. The following is a description of the shovel as given by the attorneys for the appellants in their brief prepared for this Court:

"The under frame consists of a platform mounted on wheels, similar in construction to a flat car. Extending from the rear of this platform toward the middle is located a sixty horse power steam boiler. Beyond this is a hoisting engine, the engine and boiler both being covered by a shelter or cab known as the shovel house. Each corner of the front of this shovel house (the roof) rests on an upright post six inches square. A short distance in front of the shovel house is located a steel frame in the shape of the letter A; the apex of such frame extending upwards for a distance of ten feet. This frame is constructed of two wrought steel bars six inches square and is placed there for the purpose of stopping the boom of the shovel in its swing to right or left. Between the A-frame and the end of the platform is located 'a hub cap known as a circle,' on which revolves a moving crane or boom. The arc on which this boom revolves is 210 degrees; that is, the boom can move in either direction 15 degrees more than a right angle from the center longitudinal line of the platform on which the machine is mounted. Running through a slot in the free end of the boom is a long movable metal bar, known as the dipper stick, attached to the bottom of which is a scoop or shovel. Mounted on the

boom is a seat or saddle for the craneman, and also an engine known as the crowding engine, both of which revolve with it as it turns. While capable of moving through an arc of 210 degrees in a lateral direction, the boom itself is incapable of any motion in a vertical direction. So that, if operated to the full extent of its swing, it would come every time to the same place on the A-frame, which, it has been stated, was erected as a buffer to check its motion."

The shovel was stationed near the railroad track on the Bishopville branch of defendant railroad company, and was used in filling cars with dirt that were stationed on the railroad track, and the cars, when filled, were thereupon transported to the trestles to be emptied. Necessarily, the steam shovel was moved from time to time, but when in operation it was stationary, and could reach but one car at a time, and the train of cars used in hauling the dirt, consisting of about ten in number, had to be moved as each was filled, and hence, when one car was filled the train had to be moved the length of a car so as to place an empty car opposite the steam shovel. It was necessary for some one to notice the cars while being filled, and when one was filled to signal the engineer to move the train, so as to place an empty car opposite the steam shovel.

About 2 o'clock on the afternoon of September 5, 1920, Richards, a young man about 33 years old, who had been in the employment of the railroad company for about 5 years, was standing on the steam shovel signaling the engineer to move the train as the cars were filled, and was hit by a ladder, which was attached to the boom of the shovel, as the boom swung around to empty a scoop of dirt into a car that was being filled, and from the injuries thus received he died some hours afterwards.

While the construction company was an independent contractor of the railroad company, the contract of employment provided, among the other things, that the railroad company would "furnish the locomotive and train crew for the operation of contractor's [construction company's] train while" same would be occupying the railroad company's tracks.

The train, therefore, used in hauling this dirt, was the property of the construction company, but was in charge of the train crew furnished by the defendant railroad company, consisting of a conductor, engineer, flagman, brakeman, and perhaps others. Richards was the flagman on this train. The railroad company's co-defendant was the engineer on this train.

In the complaint, the respondent claimed the right to recover under both the State Employers' Liability Act and the Employers' Liability Act of Congress. The appellants served notice of a motion to require the respondent to elect under which statute he would proceed to trial, and when the case was called for trial at the March, 1924, term of Court of Common Pleas, it was announced by the respondent that he had elected to proceed under the federal statute.

The following agreement was thereupon entered into by the appellants and the respondent: "It was then agreed between counsel that the steam shovel on which deceased was fatally injured and the train on the defendant's track which the intestate employee was alleged to be signaling at the time of his injuries were at that time engaged in interstate commerce work, but defendant's counsel refused to admit that deceased had many (evidently any) duties to perform thereon, or that he was performing any service in behalf of the defendant railroad company at the time he came to his death."

During the trial, the appellants, at the proper times, made a motion for a nonsuit, and a motion for a directed verdict, both of which were refused. The jury returned a verdict in favor of the respondent, and after refusal of a new trial judgment was entered. The appellants have appealed to this Court upon 10 exceptions.

Exception No. 1 was abandoned by the attorneys for the appellant. Exception 2 complains of error in overruling the motion for a directed verdict, and exception 10 complains of error in refusing the motion for a new trial, and, as these exceptions raise the same questions, they will be considered together. These exceptions are based upon the contentions: (1) That the deceased, at the time he received his injuries,

was not working for the defendant railroad company, but for the construction company; (2) that there is no proof of any negligence of the defendants that proximately caused the injuries; (3) that the deceased's injuries were due to his own negligence; and (4) that the deceased assumed the risk which caused his death. These questions will be considered in the order named.

The first contention is that the deceased was not acting within the scope of his duties for the defendant railroad company at the time of receiving his injuries, but, on the contrary, was working for the construction company as a volunteer. It is insisted that, inasmuch as the plaintiff failed to show that Richards had been directed or required to do this work, and that the construction company had contracted to do the work required in filling in the trestles, signaling the movement of the train while filling the cars was made a part of the work contracted to be done by the construction company.

The written contract of employment between the parties, the railroad company and the construction company, while making the construction company an independent contractor, contains the following provision: "Sec. 30. The railroad company will furnish the locomotive and *train crew for the operation of contractor's train while same is occupying the railroad company's tracks.* * * * "

Unquestionably, therefore, the train was to be operated while on the tracks of the railroad company only by its own crew, this being not only a matter of contract between the parties, but doubtless an exercise of sound judgment, and probably a compliance with wise operating rules of the railroad. At the time of receiving his injuries, Richards, a member of the crew, was signaling the movement of the train. The train was then occupying the railroad company's tracks, and the duty of Richards in giving such signals was as much a part of the movement and operation of the train as was the duty of the engineer, responding to such signals, to move the train in obedience to the signals thus given.

So, in making the contention that, when injured, Richards was not performing duties within the scope of his employment by the railroad company, the appellants do not take into consideration the terms of its contract with the construction company, nor the duties required of its employees on that occasion, including the intestate, Richards. Richards was injured while engaged in giving signals to the engineer for the movement of the train, and while the train occupied the tracks of the railroad company. The contract specifically provides that the railroad company would furnish a train crew "for the operation of contractor's train while same is occupying the railroad company's tracks * * * "; the train was then occupying the tracks of the railroad company, Richards was one of the crew furnished, and, when injured, was engaged in the performance of his duties in giving signals to the engineer for the movement of the train.

Under the contract the railroad company agreed to furnish the train crew and to operate the train upon its tracks; and the construction company agreed to operate the steam shovel, filling the cars, which. in course of operation and when filled, were carried by the train crew to the trestles and dumped. It was the duty of the railroad company to operate the train, and signaling the movement of the train to the engineer was a part of the operation; and it was the duty of the construction company to operate the steam shovel, filling the cars, and to dump same when carried in course of operation to the trestle intended to be filled.

That it was the duty of the train crew to operate the train while occupying the tracks of the railroad company seemed to be recognized by all, and properly so, because this was required by the contract; and giving signals to the engineer for the movement of the train was certainly a detail of operation and a part thereof. While this work was in progress, various members of the train crew, including the conductor and brakeman, as well as the flagman, Richards, performed the duty of signaling the movement of the train to the engineer in order to properly place the cars for loading.

The conductor himself, as appears from the evidence, performed this work at times, and knew that Richards also assisted in such work. Accordingly it was properly submitted to the jury to determine whether or not Richards was engaged in the performance of his duties within the scope of his employment when injured. Under the testimony, we think it was a question for the jury to determine whether or not deceased was acting within the scope of his employment.

In the case of *Dixon v. Chiquola Manufacturing Co.,* 86 S. C., 435, 68 S. E., 643, this Court quoted with approval the following from 26 Cyc., 1090, which is also found in substance in 39 Corpus Juris, 278: "The scope of a servant's duties is to be defined by what he was employed to perform, and by what, with the knowledge and approval of his Master, he actually did perform, rather than by the mere verbal designation of his position, and, where it is shown that the servants were in the habit of performing the work at which plaintiff was injured, he is not to be considered a mere volunteer."

In *Texas & Pacific R. Co. v. Harvey,* 228 U. S., 319, 33 S. Ct., 518, 57 L. Ed., 852, the Supreme Court of the United States said: "The other errors assigned concern the requests of the defendant below for a peremptory instruction in its favor because Harvey had placed himself in the window where none of his duties required him to be; but the record discloses that it was customary for a hostler's helper to get upon an engine and to look out of the cab window for the reasons we have stated, and for one helper to lend aid to another. We do not think that the testimony shows that Harvey was not in the line of his duties when he got upon the engine, or was a mere volunteer in going to help George in his work under the circumstances."

Furthermore, it seems from the testimony that the deceased was rendering a very unpleasant duty at the time of receiving his injuries, and had been doing so for some time. He was injured about 2 o'clock in the

afternoon on September 5th, and it was extremely hot and at a very hot place, and under such circumstances this Court will not presume that he was acting as a volunteer in rendering such services.

Now, as to the question of negligence of the defendants, if the deceased was acting within the scope of his duties, then the defendant railroad company was required to furnish the deceased a reasonably safe place whereon to perform the duties.

The railroad company furnished a cab or caboose for the use of the train crew while operating the train.

This cab or caboose evidently afforded a safe place for the crew to signal the required movement of the train to load the dump cars, for the crew could give such signals either from the cupola or platform of the cab or caboose. From the cupola, or platform thereof, a trainman would not only be in full view of the steam shovel, but would have an unobstructed view over and across the flat dump cars to the engine, and could easily and safely give the necessary signals for train movement, while loading. Instead of keeping the cab or caboose upon the work, the conductor, representing, of course, the railroad company, left it continuously at the junction point, and instead used, adopted, or acquiesced in the use of a place upon the flat car which bore the machinery connected with the steam shovel. The conductor not only knew that his trainmen used this place constantly to signal the movement or operation of the train while the cars were being loaded, but used it himself for this purpose.

So, therefore, it became a question for the jury to say whether or not the railroad company in this manner used, adopted, or acquiesced in the use of this place upon the flat car, bearing the steam shovel and its equipment, for the purpose of signaling the movements or operation of the train. Was this a safe place? The testimony shows, or tends to show, that it was not.

This Court, in the case of *Bunch v. American Cigar Co.,* 126 S. C., 324, 119 S. E., 828, speaking through Mr. Associate Justice Cothran, has correctly stated:

"Where an injury is shown to have resulted from an unsafe place to work, a *prima facie* case of negligence is made out against the Master, and he has the burden of exculpating himself." The evidence in the record shows, or tends to show, that the intestate was not furnished a reasonably safe place to work, and a presumption of negligence, not only arises therefrom, but is shown by the evidence.

The Master is not only required to exercise reasonable care in selecting and furnishing a reasonably safe place to work, but to use due care to see that there are no adjacent or connected dangers or perils, which may injure the servant. In fact, not only the actual place for work, but the surrounding conditions and appurtenances, must be reasonably safe also. The Master ought to exercise reasonable care to see that the place furnished to work is free from adjacent or connected perils or dangers, as far as may be reasonably done or foreseen.

The evidence in the record shows, or tends to show, that the master in the instant case did not exercise due care in furnishing Richards, its employee, a safe place to work, reasonably free from adjacent or surrounding perils, dangers, or menaces, but by failing to exercise reasonable forethought and care in respect thereto allowed the intestate to work in an unsafe place, and that his injuries were due thereto as a proximate cause. There being evidence to sustain the contentions of the plaintiff in this respect, there was no error in submitting these questions of negligence and proximate cause to the jury.

The appellant's contention that the negligence of the plaintiff's intestate caused the injuries is based upon the alleged facts that the deceased was standing on the jack arm at the time he received his injuries, and that this was a dangerous place, in that, when the shovel, in emptying a scoop of dirt, swung as far as it could in that direction, there was always only a distance of four inches between the ladder attached to the boomed and the post at which the deceased would have been standing, and, consequently, when

the shovel made a full swing, which it was claimed was being done very frequently, the ladder on the boom would necessarily have hit the deceased when standing in that position.

There are two answers to this contention. The evidence does not show conclusively that the deceased was standing on the jack arm at the time he received his injuries. A disinterested party altogether, who happened to be there showing his boys the operation of the shovel, testified that the deceased was standing on the platform of the shovel at the time he received his injuries. But, even if the deceased was standing on the jack arm, and was hit as contended by the appellants, they have not satisfied this Court that the danger of such place was appreciated by the deceased. All of the employees of the construction company, who were acquainted with the operation of this shovel, perhaps knew that it was a dangerous place. They no doubt knew the extent of the swing of the shovel and of the nearness of its approach to the post against which it is claimed that the deceased was leaning. But there is nothing to show that the deceased realized this. The brakeman on this train, who, although he testified for the plaintiff, seems to have been a very impartial witness, and a witness of at least average intelligence, testified that he used the same place, and that he did not consider it very dangerous. The conductor of this train admitted on direct examination that he had seen others occupy this same position, but denied on redirect examination that he had ever seen the deceased, or anybody else, spotting cars there.

The contention that the injuries were caused by the sole negligence of the plaintiff's intestate cannot be sustained. As we have just pointed out, the evidence shows, or tends to show, that the injuries sustained by the intestate were caused by the negligence of the defendant railroad company in not furnishing a reasonably safe place to work; hence such injuries could not have been caused by the sole negligence of the intestate.

And what has been said with regard to appreciating the danger applies with equal force to the question of assumption of risk. A servant does not assume risk

that is attributable to the negligence of the master, of which the servant is ignorant, unless the risk was so obvious that the law charges him with notice thereof. This has been long established by the Supreme Court of the United States, *Seaboard A. L. R. Co. v. Horton,* 233 U. S., 492, 34 S. Ct., 635, 58 L. Ed., 1062, L. R. A., 1915-C, 1, Ann. Cas., 1915-B, 475; *Chesapeake & O. R. Co. v. Proffitt,* 241 U. S., 462, 36 S. Ct., 620, 60 L. Ed., 1102; and is the ruling of this Court, *Barnhill v. Cherokee Falls Mfg. Co.,* 112 S. C., 541, 100 S. E., 151. And in *Barnhill v. Cherokee Falls Mfg. Co., supra,* this Court quoted with approval the language of Mr. Justice Holmes (now Associate Justice of the United States Supreme Court) in the Massachusetts case of *McKee v. Tourtellotte,* 167 Mass., 69, 44 N. E., 1071, 48 L. R. A., 542, that, "when we say that a man appreciates a danger, we mean that he forms a judgment as to the future, and that his judgment is right." We think that the Court was right in overruling the motion for a directed verdict, and in refusing the motion for a new trial.

At the close of the plaintiff's testimony, the appellants made a motion for a nonsuit, and at the close of all the testimony, the appellants made a motion for a directed verdict, based upon the same grounds as the motion of nonsuit. The record shows that on the motion for nonsuit the Court heard four arguments thereon, two by each side, apparently without any limitation. Upon the motion for a directed verdict being made, the following took place:

The Court: "That question of the independent contractor, what are the facts before the United States Supreme Court?"

The Court: "That is the only point you need to submit to me." (Argument by counsel for the defense.)

The Court: "I don't mean to shut you off, but there is no use for you to waste your breath."

Mr. Davis: "Your Honor, we have that case and another leading case on the subject."

The Court: "We will have another leading case. That does not appeal to me, to my good sense and ideas of justice."

Mr. Wolfe: "Your Honor, there is quite a distinction."

The Court: "I don't see how the liability can be shifted to somebody else."

Mr. Davis: "I have other cases, your Honor."

The Court: "I have already made up my mind."

The Court: "Have the jury come back, and proceed with the arguments to the jury."

Mr. Davis: "Your Honor will not grant the motion?"

The Court: "No, sir; I refuse the motion."

The foregoing is the basis for the third exception, which charges the trial Court with error in refusing to allow full arguments on the motion for a directed verdict, and to follow the decisions of the United States Supreme Court. Ordinarily, the conduct of the trial and the limitation of arguments on motions arising during a trial are in the sound discretion of the trial Judge. After the trial Judge had permitted full argument on the same questions on the motion for a nonsuit, we cannot see how it can be claimed that the trial Judge abused his discretion in this instance.

Furthermore, the case of *Chicago, R. I. & P. R. Co. v. Bond,* 240 U. S., 449, 36 S. Ct., 403, 60 L. Ed., 735, which was being argued by the appellants, was not an authority for their motion. That was a case in which an independent contractor was suing his employer, and the Court held that, inasmuch as he was an independent contractor, he could not recover. The question, which was presented to the trial Judge in this case, was not whether or not the construction company was an independent contractor; that was admitted by both sides. The question was: For whom was Richards working at the time of receiving the fatal injuries: Was he working within the scope of his employment for the railroad company, or was he working outside of the scope of his employment for the construction company as a mere volunteer? Had it been conceded that Richards was working for the construction company, and not within the scope of

his employment for the railroad company, then the case sought to be argued by the attorneys for the appellants would have been an authority for their motion, and the trial Court would have been bound to grant the motion. This exception is therefore overruled.

The Court charged the jury as follows:

"Under this Act of Congress, if a man contributes to his own injury, and is an employee of a railroad company, as in this case, that does not bar a recovery, and he might recover if he is entitled to recover, on account of the negligence of the railroad company."

And it is contended that this was a charge on the facts. While this portion of the charge does state that the deceased was an employee of the railroad company, this was an admitted fact. All of the defendant's witnesses testified that Richards was employed by the defendant railroad company. The question, therefore, before the Court, was not by whom was Richards employed, but whether or not he was acting within the scope of his employment at the time of receiving his injuries, and the jury were correctly instructed as to this in another portion of the charge. This exception is overruled.

The fifth exception is as follows:

"The Court erred in charging the jury: 'Now, there is nothing in this complaint, I call your attention to that, that there is nothing in this complaint as to the Williams Bros. Construction Company, so they have nothing to do with this issue here. Simply the issues that have been stated to you; those are the only issues for your consideration. They were there doing their work, but they have nothing to do with this verdict, so far as you care, they were there doing their work, they were there just as this man in that automobile. They have nothing to do with the acts of negligence or carelessness that have been charged, so far as your verdict is concerned, because they are not parties to this action. A great deal has been said about that in the display of those pictures, and I call your attention to that that you have nothing to do with that at all'—the error being that

the principal defense relied on by the defendants in their evidence was that when plaintiff's intestate received his fatal injury he was performing a service for the independent contractor, the construction company, and not for the defendant railroad company, and could not have been injured by the negligence of the latter, and by this charge they were completel deprived of such defense."

We cannot see how the jury could have been led to such a conclusion as contended by the attorneys for the appellant. The Court charged the jury: "If he (Richards) was not working for the railroad when he was killed, but was working for the Williams Construction Company, as an independent contractor, and was killed by reason of their negligence, and not by the negligence of the railroad company, then the plaintiff could not recover"; and further: "If he (Richards) was purely a volunteer, and under his work with the railroad company he was not required to spot cars, if you find that, and he was doing this work of his own free will, voluntarily, and the railroad did not furnish the place where he was working, why, he can't recover." The charge must be take as a whole, and the eighth and ninth exceptions show that the jury were correctly instructed on this matter.

The sixth exception imputes error to the trial Court in charging the jury that "the Federal Employers' Liability Act applies to all persons engaged in interstate commerce." We fail to see the position of the appellant by this exception. Even if the charge is erroneous, as complained of, we do not see how it could have affected the defendants. At the outset of the trial, they admitted that, if Richards was working for them, the Federal Employers' Liability Act (45 U. S. C. A., §§ 51-59) applied to this case, and it seems to us that their situation would not have been changed in any manner whatsoever, if this statute were applicable to all persons engaged in interstate commerce.

The seventh exception is as follows:

"The Court erred in charging plaintiff's twenty-first and twenty-second requests, as follows:

" '(21) The duty which the master owes the servant to furnish him a safe place and safe appliances with which to work is a personal duty which the master owes the servant. The master cannot delegate this duty to another, or leave it to be performed by another, which is but another way of saying that the master cannot leave the personal duties which the law requires him to perform to another.

" '(22) But if the master does leave the personal duty of furnishing a safe place and suitable appliances to another then the master is still liable for a failure to descharge this personal duty which he owes to his servant under the law. That word "personal," I don't like that in there. I think— better strike that out. I don't think he has got to do that in person. With that amendment I charge that'—the error being

"(1) That the master is only required to exercise reasonable care and to make reasonable effort to furnish a safe place to work and suitable appliances with which to work; and (2) the remainder of the charge was inapplicable to any issue in the case and tended to mislead and confuse the jury."

In the twentieth request to charge, submitted by the plaintiff, the Court charged the jury as follows:

" '20. The law requires the master to furnish safe and suitable appliances with which to perform the work to be undertaken; and if the master fails in this duty he is guilty of negligence.'

"That is a duty which the master owes the servant. *That ought to be qualified by a reasonably safe place and appliances with which to work.*"

Again in his general charge the Court instructed the jury:

"The items of negligence that I conceive that I ought to charge you on is the item of not furnishing a safe and suitable place. Reasonably safe place, not absolutely safe place. It is not required that the railroad company furnish an absolutely safe place to work—only a reasonably safe and suitable place in which to work."

These instructions are to be taken in connection with the twenty-first and twenty-second requests of the plaintiff, and, this done, it will be seen that the Court fully and correctly charged the jury in respect to this matter.

The twenty-first request to charge dealt with, not the extent of the duty of the master to a servant, but the right to delegate his duty. The extent of the duty had been clearly charged elsewhere. And if the contention of the respondent that the defendant railroad company had failed to furnish any place whatsoever for the work which the deceased was doing at the time he received his injuries, and the place which was furnished was that furnished by the construction company, was to be submitted to the jury, we think the twenty-second request to charge was entirely proper. This exception is overruled.

The Court charged the jury that:

"If he (Richards) was not working for the railroad when he was killed, but was working for the Williams Construction Company, as an independent contractor, and was killed by reason of their negligence, and not by reason of the negligence of the railroad company, then the plaintiff could not recover."

The eighth exception charges that this was error, in that "the jury was thereby permitted to determine the question of liability by the fact of employment alone." This exception is obviously without merit. It was conceded that the deceased was working at the time he was injured. He was either working in the scope of his employment for the defendant railroad company, or he was working as a volunteer for the Williams Construction Company, who was an independent contractor, and this charge correctly covered the matter.

The ninth exception is as follows:

"The Court erred in charging as follows with reference to the defendant's eleventh request:

" '(11) The Court charges the jury that the work being performed at the time deceased came to his death, to wit, the loading of the train with dirt, was the work of the inde-

pendent contractor Williams Bros. Construction Company and not the work of the defendant railroad company as master of the deceased, and that under the Employers' Liability Act of Congress under which the suit is brought the defendant railroad company is not liable, either to the employees of the Williams Bros. Construction Company or to any member of the train and engine crew furnished by it to Williams Bros. Construction Company for any injury sustained during such loading of the train.

" 'I charge you that with this modification: If the railroad company put the deceased to spot cars under their direction, and if he was spotting cars under their direction, I charge you that the railroad company would be liable, otherwise they would not'—the error being that the request as presented contained a correct proposition of law directly applicable to the issues in the case, and the modification was not only confusing and unresponsive to the facts of the case, but was an incorrect statement of the law in that it made the railroad company liable under the Act of Congress for the death of one of its servants furnished to an independent contractor irrespective of any question of negligence on its part constituting the proximate cause of such death."

It seems to this Court that the modification complained of was too favorable to the appellants. As we have already held in disposing of the second exception, the question was not whether the railroad company had directed deceased to spot cars, but what he did with the knowledge and approval of his master. And as to the contention that this modification "made the railroad company liable under the Act of Congress for the death of one of its servants furnished to an independent contractor irrespective of any question of negligence on its part constituting the proximate cause of such death," the question of negligence and proximate cause had been fully and completely covered in other portions of the Judge's charge.

All the exceptions are overruled, and judgment is affirmed.

**152**

Mr. Chief Justice Watts and Mr. Justice Stabler concur.

Mr. Justice Carter did not participate.

Mr. Justice Cothran (dissenting) : I am obliged, respectfully, to register my disagreement with the conclusions announced in the opinion of Mr. Justice Blease in this case, for the reasons which follow:

I shall address my observations to what I consider the only ground upon which the plaintiff could even hope for an affirmance of the judgment appealed from, namely, that there was evidence in the case tending to show that the railroad company failed in its duty to exercise ordinary care in providing the deceased servant with a reasonably safe place in which to perform the service required of him. I think, for the reasons hereinafter stated, that the plaintiff has utterly failed to offer any evidence tending to establish negligence on the part of the railroad company in this respect, and that its motion for a directed verdict should have been granted.

The action is by the plaintiff, as administrator of the estate of W. Baylor Richards, who was killed under the circumstances hereinafter detailed, on September 5, 1920, at a time when he was *in the employment* of the defendant railroad company as a flagman. Whether, at the time of his death, he was acting within the course of his employment, is a material issue in the case. The case was tried before his Honor, Judge Henry, and a jury, in March, 1924, resulting in a verdict of $20,000 in favor of the plaintiff. From the judgment entered thereon the defendants (the railroad company and its engineer) have appealed.

The main issue in the case is whether the Circuit Judge should have granted the motion of the defendants for a directed verdict. The undisputed facts are these:

On April 27, 1920, Williams Bros. Construction Company and the defendant railroad company entered into a written contract, whereby the construction company engaged to fill in certain trestles on the line of the railroad company, known as the "Bishopville Branch." The construction company fur-

nished the locomotive, a train of dump cars, a steam shovel, all other machinery and equipment necessary for the performance of the work, and a force of laborers. The railroad company supplied a train crew, consisting of a conductor, an engineer, a flagman, and a brakeman, for the purpose of moving the train back and forth between the place of loading and the place of dumping; the loading at the excavation point and the unloading at the trestles being under the sole direction and control of the construction company.

In excavating and loading earth into the train of dump cars, the construction company used a Marion steam shovel. The steam shovel was placed upon a side track, parallel with the main line upon which the train of dump cars was placed. The steam shovel being for the time stationary, and swinging a dipper full of earth from the point of excavation to the dump cars, it became necessary, as a dump car would be filled, to move the train, so as to bring an empty car in position for loading. This movement was controlled by the engineer on the locomotive, upon a signal transmitted to him by some one at or near the steam shovel. The process was called "spotting," and although the construction company had a man specially employed as a "spotter" it appears that the conductor, the brakeman, and the deceased flagman, employed by the railroad company, were accustomed at times to act as "spotters."

On the date mentioned, about 2 o'clock p. m., the deceased was upon some part of the steam shovel intending to act as a "spotter." As the boom of the steam shovel swung around back to the excavation point, after having deposited a load of earth in a dump car on the main line, the deceased was caught between certain parts of the steam shovel and crushed to death. A description of the steam shovel appears necessary for an understanding of the accident. I will adopt, as Mr. Justice Blease has done in his opinion, in part, the description of the machine which appears in the argument of counsel for the appellant, as follows:

"The under frame consists of a platform mounted on wheels, similar in construction to a flat car. Extending from the rear of this platform towards the middle is located a sixty horse power steam boiler. Beyond this is a hoisting engine, the engine and boiler both being covered by a shelter or cab known as the shovel house. Each corner of the front of this shovel house rests on an upright post six inches square. A short distance in front of the shovel house is located a steel frame in the shape of the letter A; the apex of such frame extending upwards for a distance of ten feet. This frame is constructed of two wrought steel bars six inches square and is placed there for the purpose of stopping the boom of the shovel in its swing to right or left. Between the A-frame and the end of the platform is located 'a hub cap known as a circle,' on which revolves a moving crane or boom. The arc on which this boom revolves is 210 degrees; that is, the boom can move in either direction 15 degrees more than a right angle from the center longitudinal line of the platform on which the machine is mounted. Running through a slot in the free end of the boom is a long movable metal bar, known as the dipper stick, attached to the bottom of which is a scoop or shovel. Mounted on the boom is a seat or saddle for the craneman, and also an engine known as the crowding engine, both of which revolve with it as it turns. While capable of moving through an arc of 210 degrees in a lateral direction, the boom itself is incapable of any motion in a vertical direction. So that, if operated to the full extent of its swing, it would come every time to the same place on the A-frame, which, it has been stated, was erected as a buffer to check its motion."

I do not think that this extract is complete, as, in my opinion, it omits certain exceedingly important details, which appear later in the argument of counsel, and are amply sustained by the evidence. In addition to the extract quoted, the following facts, in my opinion more completely setting forth the description, should appear:

(The situation will be perfectly understood by reference to photograph No. 3, Exhibit N, offered in evidence, a re-

production of which the size of a page of the reports, should be incorporated in the report of the case.)

Attached to and parallel with the boom, was a small iron ladder, the lower end of which was far enough up on the boom to clear the leg of the "A-frame" when the boom, in its circular, horizontal movement, became arrested by contact with the "A-frame," put there for that purpose; the ladder,

however, having cleared the leg of the "A-frame," came within four inches of the wooden post which supported the corner of the roof of the shovel house. Attached to the solid iron base, to which the leg of the "A-frame" was attached, at the corner of the shovel house, there was an iron brace, called the "jack arm." It was intended, with its companion on the other side of the shovel house, to steady the entire structure; its lower end was anchored firmly in the ground, and its upper end passed through an iron eye attached to the base of the "A-frame," and terminated in a threaded point with a nut upon it. The top of the iron frame through which the "jack arm" brace extended, and to which it was attached, was about a foot above the floor of the shovel house, and about 18 inches above the running board along the side of the shovel house. It afforded space for only one foot of a man standing upon it. It is obvious that a man, standing on the upper end of the "jack arm," would inevitably be caught and crushed between the corner post of the shovel house and the iron ladder attached to the boom, if he did not move from that position as the boom swung around and was arrested by the "A-frame." It is also obvious that a man standing on the running board, alongside of the shovel house, which terminated at the corner post, could not possibly have been struck by either the boom or the ladder attached to the boom.

It appears, therefore, absolutely certain that the deceased was standing on the iron frame, the upper end of the "jack arm," and was crushed between the corner post of the shovel house and the ladder attached to the boom. The evident cause of being thus caught was the failure of the deceased to appreciate the fact *that, while the "A-frame" protected him from the boom, it did not protect him from the ladder which was attached to the side of the boom.* It will be observed that there was an iron ladder upon each side of the boom, the lower part of which had to clear the "A-frame," or it would be crushed as the boom swung around against that frame.

This is a most remarkable suit in several aspects:

Although the deceased was engaged in a duty which unquestionably devolved upon the construction company, under its contract with the railroad company, the process of loading the cars, no complaint is entered against the construction company. It may be that, if the construction company knowingly accepted the service of the deceased in "spotting" the cars, it would have owed to him the duty of exercising ordinary care in providing for him a reasonably safe place in which to perform the accepted service. If any one owed the deceased that duty, and if any one breached that duty, it was the construction company, and not the railroad company. It may be, too, under the circumstances, that the construction company owed to the deceased the duty of operating the machine with due care. *Jackson v. Southern R. Co.*, 73 S. C., 557, 54 S. E., 231.

No negligence in the operation of the machine is alleged; no defect is alleged to have existed in any part of it; nothing appears but the bare fact that the deceased, standing upon a part of the machine, not intended for that purpose, was crushed by the movement of the boom, in the perfectly orderly manipulation of the steam shovel, so far as the evidence shows. The fault of that calamity is laid at the door of the railroad company, which had absolutely nothing to do with the operation of the steam shovel, upon the ground that at the time the deceased was working for the railroad company, which owed him the duty of preventing him from assuming the position in which he lost his life.

I think that, if the action had been against the construction company, instead of against the railroad company, under the evidence adduced, it would have been impossible for the plaintiff to have escaped the direction of a verdict in favor of the construction company; for there is no evidence tending to show that the deceased was directed, or even expected, to assume the position which he did assume, no evidence of a defect in any part of the machine, and no evidence of its negligent operation.

The plaintiff seems purposely to have avoided any allegation as to the negligent operation of the machine, or as to any defect in it, lest he might shift the responsibility from the railroad company, which he sued, to the construction company, which he had not sued.

The action being against the railroad company, and not against the construction company, the plaintiff was under the greater burden. It was incumbent upon him to offer some evidence tending to establish the fact, in the first instance, that as a servant of the railroad company the deceased was, at the time of his injury, engaged in a service for his employer, within the course of his employment; and, assuming that there was some evidence tending to establish that fact, that the evidence further tended to show that the railroad company had breached its duty of exercising ordinary care to provide for the deceased a reasonably safe place in which to perform the required service.

It is manifest that, if the deceased was not at the time of his injury attempting to perform a service required of him by the railroad company, the case for the plaintiff falls; and it is equally manifest, assuming that to be a fact, that, if there was no evidence tending to establish a breach of duty upon the part of the railroad company to exercise ordinary care to provide him with a reasonably safe place within which to perform the service required, the case for the plaintiff falls.

The appeal turns upon a decision of one or both of the questions thus presented.

I. Was the deceased, at the time of his injury, engaged in a service required of him by the railroad company?

There are two considerations that I think lead inevitably to a negative answer to this question. The deceased was employed by the railroad company *as a flagman,* one of the crew charged, not with the loading or unloading the train, but with operating it back and forth from the point of loading; his duty as a flagman was to protect the rear of the train, which was upon the main line, from collisions with

other trains, while it was being loaded at the gravel pit, while it was in motion towards the trestle to be filled in, while the cars were being unloaded at the trestle, and while the emptied train was being returned to the excavation point. His duties were naturally limited to the portion of the work undertaken by the railroad company, which by the contract with the construction company had nothing to do with either the loading or unloading of the cars. "Spotting" the cars was an incident to the loading; there is not a particle of evidence tending to show that the railroad company undertook to assist the construction company in this act; on the contrary, it appears that the construction company had a man employed for this specific duty, and at no time relied upon any employee of the railroad company, as a duty owed to it by the railroad company, to perform this service.

It is true, that the conductor and the brakeman were accustomed, at times, to engage in the process of "spotting" the cars; but it nowhere appears that they did so in obedience to instructions from the railroad company, or as carrying out what they supposed was required of the railroad company. The conductor testified:

"If Mr. Richards was up there signaling cars, he was in the act of performing a duty which he was not to do under his employment with the Coast Line. His duty was to flag the train, and to protect the train from other trains. It was not a part of his duty to signal those cars for the Williams Bros. Construction Company, to spot those cars. I had never told him to go there and do that work. I never gave him any instructions to spot cars. *He volunteered to do that for them.* They were not paying him—not that I know of. * * * I had not given permission for Richards to act as spotter. Richards did not ask me if he could spot cars. The Williams people did not ask me to allow members of my train crew to spot cars. There was nothing said about it at all. He simply went ahead and did it, and nothing else was said about it. It was not a part of his duty."

The only evidence in the case, and that comes from the only witness offered by the plaintiff to the immediate facts of the case, as well as from the defendant, is to the effect that the "spotting" by the employees of the railroad company was sporadic, and entirely voluntary, without authority of the defendant, and without the direction of any one connected with it, or a request by the construction company. As well might it be held that, if the locomotive engineer had exchanged places with the engineer of the steam shovel, the railroad company would have been under obligation to provide for him a safe place in the steam shovel, and the proper operation of it.

There certainly is no evidence tending to show that either the conductor or the brakeman attempted to spot cars from the position occupied by Richards when he received his hurt. The conductor testified:

"I sometimes spotted cars myself. I did that just so. That was not a part of my duty. It was no part of my duty to spot those cars. I did it voluntarily. I did it simply to help out. I would stand in different places when I spotted cars. I stood on the running board; I stood on the opposite side of the train. I never stood on this jack arm. It was too dangerous. I never stood there. I stood also on the dump cars. But I never stood where Mr. Richards was standing when he was killed. I have never seen anybody else standing on the jack arm to spot cars, or for anything else. Richards could have spotted cars from across the track, or from other places. This jack arm was a dangerous place."

The brakeman was asked, referring to a position on top of the "jack arm": "Did you ever stand there? A. No, sir. Q. Why not? A. Well, I considered back on the running board safer."

In Thomp. Neg., § 4677, it is said:

"An employee who undertakes without the order or request of his employer, or the representative of the employer, or contrary to his orders, or in compliance with the orders or requests of another employee, who has no authority from

the employer to give such orders or to make such a request, to perform work outside of the scope of his employment or upon dangerous premises, where the terms of his employment do not require him to do or be  *  *  *  is deemed to assume the risk attendant upon his voluntary undertaking, and cannot recover for injuries occasioned by any defect in the premises, machinery or tools to which he thus voluntarily exposes himself. The reason of the rule is obvious. The master undertakes to exercise reasonable care to the end of keeping his premises, his machinery, his tools and his appliances in a reasonable condition of safety for the protection of the servant employed in a stated service and so long as he continues in that service. But when he places himself outside of the line of his duty, the relation of master and servant is deemed to be temporarily suspended. His position is then in all things that of a trespasser or bare licensee. The master owes him no duty to anticipate his deviation from his duty and the possible danger which may arise to him therefrom, and to provide against it. He takes things as he finds them and suffers all consequences of his own error and cannot make his master liable therefor. The law will not on obvious grounds of justice, compel the master to pay damages which the servant has brought on himself by undertaking to do something which the master did not employ him to do, but will ascribe his calamity to his own unnecessary and gratuitous act."

"In all jurisdictions  *  *  *  it would probably be held, as it has been held in Massachusetts, that the servant is debarred from recovery, as a matter of law, where he was injured while engaged in work outside his ordinary duty, which was undertaken at the suggestion of a fellow workman, and with the mere consent of his immediate superior." 3 Labatt (2d Ed.), § 1300.

The only cases that I have found which hold the master responsible for defects in the tools, appliances, or places of work supplied by third parties are cases in which the master, in discharging the obligations imposed upon him or for

his own purpose and convenience, adopted the tools, appliances, or places of such third parties and used them as such; a situation far from paralleling the case at bar.

II. Admitting for the sake of argument, what is by no means conceded, that the plaintiff at the time of his injury was an employee of the railroad company, and engaged in a service within the course of his employment, and that his injury was due to his occupying a position on the steam shovel which was not reasonably safe, under the circumstances, it seems clear that the liability of the railroad company for the injury sustained by him, is dependent primarily and essentially upon proof of the fact that the railroad company selected or adopted that particular place for his work. The duty of a master in providing a reasonably safe place for the work of the servant is exactly the same as his duty in providing reasonably appropriate tools and appliances. I do not apprehend that any one would insist upon the liability of the master for an injury resulting from the use of a defective or unsuitable tool or appliance, unless the master had furnished such tool or appliance with which the servant was expected to work.

And so here the plaintiff is reasonably required to show, not only that the place was unsafe and that he was injured in consequence, but also that the railroad company required his services at that particular place. I do not think that there is a particle of evidence tending to establish this essential foundation of the plaintiff's cause of action. On the contrary, the only witness presented by the plaintiff, as to the circumstances attending the unfortunate occurrence, testified that there were at least three other places where the deceased might safely have stood in performing the service of "spotting" the cars. How, then, can it be argued that the railroad company required the servant to work at this particular place?

The brakeman, Sompayrac, was put up as a witness for the plaintiff. His veracity is underwritten by the plaintiff, and he has the commendation of the writer of the leading

opinion. Sompayrac had been "spotting" cars *while standing upon the running board* of the shovel house and gave place to the deceased. If Sompayrac could perform this service from the running board, why could Richards not have done so? And why should not the running board be considered the place provided for the service, instead of the perch on top of the "jack arm"? In addition to the running board, there were other perfectly safe places, where the service might have been performed. I think that there is as much reason to hold that the duty would have been breached if the deceased had climbed up on the circulating boom, and had been injured there, while there were half a dozen safe places which he might have occupied.

The authorities universally hold that the place as to which complaint is made must have been a place provided by the master for the service. It cannot be assumed simply from the fact that a servant was injured at a particular place, which the result shows to have been a place of danger, that that was the place provided by the master for him to work, particularly in view of the positive evidence in the case that there were other places perfectly safe.

In *Broadway Coal Min. Co. v. Render* (Ky.), 119 S. W., 198, it is said: "The duty of the master to furnish a reasonably safe place applies only to the place which the employé is *required to use* for the purpose of performing his duty."

In *Harper v. Illinois Cent. R. Co.,* 131 Ky., 225, 115 S. W., 198, it is said: "But the duty of furnishing reasonably safe appliances and reasonably safe places and premises is confined to the appliances and places and premises with which the servant is *required to work, or in which his duties require him to be."*

In *Smith v. Trimble,* 111 Ky., 861, 64 S. W., 915, the Court said: "And when appellant, without invitation or knowledge of the owner, went into or upon other parts of the premises, not necessary for the performance of his labor, he assumed all the risks of doing so. He was neither required, expected, nor allured to be at the place where he was injured,

and consequently appellee was under no duty to him to provide there a place of safety."

In *Albert v. McKay & Co.*, 174 Cal., 451, 163 P., 666, the Court said: "The negligence charged in the first count is the failure to comply with the employer's duty to furnish his employé with a reasonably safe place to work. The duty is limited to *'the premises where the employé is required, for the purposes of his employment, to be.'*"

In *Harris v. Det, etc.*, 75 N. J. Law, 861, 70 A., 155, the Court said: "A master's duty in respect to furnishing his servants a safe place in which to work extends to such parts of his premises only as he *has prepared for their occupancy* while doing his work, and to such other parts as he knows or ought to know they are accustomed to use while doing it."

"The duty of a master to furnish a safe and suitable place for his servants to do their work in extends only to such portions of the premises *as he has prepared and designed for their occupancy* while doing his work, and to such other parts as he knows, or ought to know, they are accustomed to use while doing it." *Morrison v. Burgess, etc., Co.*, 70 N. H.. 406, 47 A., 412, 85 Am. St. Rep., 634.

"A master's duty to furnish his servant with a safe place in which to work extends to such parts of his premises only *as he has prepared for their occupancy* while doing their work, and to such parts as he knows, or ought to know, they are accustomed to using while doing it." *Triangle Lumber Co. v. Acree*, 112 Ark., 534, 166 S. W., 958, Ann. Cas., 1916-B, 773.

"A master's duty in respect to furnishing his servant with a safe place in which to work, extends to such parts of his premises only *as he has prepared for their occupancy* while doing their work, and to such parts as he knows or ought to know they are accustomed to using while doing it." Labatt (1st Ed.), § 1558b.

"The employer is not an insurer of the employee's safety. He is liable for the consequences of his negligence but not of the dangers of the employment." 39 C. J., 260.

It appears, therefore, to me, that the railroad company assumed no obligation whatever to the deceased in the matter of his outside, voluntary service in "spotting" cars, and that, if it had, there is no evidence tending to show a breach of duty in the matter of the place selected by the deceased, unusual, unfitted for the service, and of the greatest peril, as the result unfortunately has shown. The foundation of the plaintiff's claim is that, because Richards selected the spot to stand upon, the railroad company must be assumed also to have selected it and required him to work there.

III. There does not appear to be a doubt but that his Honor committed reversible error in charging the jury, as complained of in the seventh exception. The difference is technical and may not have a very controlling effect upon the ordinary jury, between the correct and the incorrect statement of the master's duty as to places of work. The correct rule is that the master *must exercise ordinary care* to provide the servant with a reasonably safe place in which to work. To say that it is the duty of the master to provide reasonably safe places is to make that an absolute duty, and not one limited to the exercise of ordinary care. *Washington & G. R. Co. v. McDade,* 135 U. S., 554, 10 S. Ct., 1044, 34 L. Ed., 235; *Baltimore R. Co. v. Groeger,* 266 U. S., 521, 45 S. Ct., 169, 69 L. Ed., 419; *Smith v. Seaboard Air Line R. Co.,* 182 N. C., 290, 109 S. E., 22.

Can it be said, assuming that the railroad company was under any obligation with respect to *the place selected by the deceased,* that it failed in its duty to exercise ordinary care to provide him with a reasonably safe place, when the servant himself selected the dangerous place, while there were half a dozen perfectly safe places at hand? The Employers' Liability Act has not altered the requirement that, in order to hold the master liable for an injury to his servant resulting from a defective appliance or an unsafe place, negligence on the part of the master must be shown. What possible care could the railroad company in this case have taken to prevent the deceased from occupying the position which he had assumed?

Attention should be called to the statement in the opinion of Mr. Justice Blease that it was not shown that the deceased was on the "jack arm" when he was hurt, and not on the running board, and the testimony of the outsider, Woodham, is invoked to that end. Woodham testified that he saw the deceased on the running board: "The last I saw of him he was standing on this running board. I could not have seen him when the shovel hit him, if I had been looking, as I was standing so that the shovel passed between me and him. * * * He was right in front of me, but I could not see where he was when he was struck, as this boom was between us." The evidence shows that, if he had been on the running board, it was impossible for the boom or the ladder to have struck him. The witness also testified that he was caught between that "arm" and the post, which could not have occurred if he had been on the running board.

### Order

Mr. Chief Justice Watts. The mandate of the Supreme Court of the United States (276 U. S., ——, 49 S. Ct., 210, 73 L. Ed., ——) having been filed in the above-stated case, reversing the judgment of this Court, and remanding the case thereto:

It is ordered that the above-stated case be remanded to the Court of Common Pleas for Orangeburg County, with direction to enter judgment in favor of the defendants under Rule 27 of this Court.

By order of the Court.