18869

Janet MICKLE, by her Guardian *ad litem,* W. E. Mickle, Plaintiff-Respondent-Appellant, v. Larry Wayne BLACKMON, Respondent, and Ford Motor Company, Incorporated, Respondent-Appellant.

(166 S. E. (2d) 173)

204

208

*Messrs. John M. Spratt,* of York, and *Taylor B. Rion,* and *Robinson, McFadden & Moore,* of Columbia, *for Appellant, Cherokee, Inc.,*

Messrs. *James P. Mozingo, III,* and *D. Kenneth Baker,* of Darlington, *Hayes, Brunson & Gatlin,* of Rock Hill, *William E. Chandler, Jr.,* of Greenville, and *Greer & Chandler,* of Darlington, *for Respondent, as to Appellant, Cherokee, Inc.,*

*Messrs. John M. Spratt,* of York, S. C. *and Taylor B. Rion and Robinson, McFadden & Moore* of Columbia, *for Appellant, Cherokee, Inc., in Reply,*

*Messrs. James P. Mozingo, III, and D. Kenneth Baker,* of Darlington, *Hayes, Brunson & Gatlin,* of Rock Hill, *William E. Chandler,* of Greenville, *and Greer & Chandler,* of Darlington, *for Appellant, Janet Mickle,*

*Messrs. Vernon E. Sumwalt,* of Rock Hill *and William B. Webb (now deceased),* of Charlotte *for Respondent, Ford Motor Company,*

*Messrs. James P. Mozingo, III, and D. Kenneth Baker,* of Darlington, *Hayes, Brunson & Gatlin,* of Rock Hill, *William E. Chandler, Jr.,* of Greenville, *and Greer & Chandler,* of Darlington, *for Apellant, Janet Mickle, in Reply,*

*Messrs. Vernon E. Sumwalt,* of Rock Hill, *and William B. Webb (now deceased),* of Charlotte, N. C., *for Ford Motor Co., contingent and alternative Appellant,*

*Messrs. James P. Mozingo, III, and D. Kenneth Baker,* of Darlington, *Hayes, Brunson & Gatlin,* of Rock Hill, *and Greer & Chandler,* of Darlington, *for Appellant, Janet Mickle, in response to alternate appeal,*

*Messrs. Vernon E. Sumwalt,* of Rock Hill, *and William B. Webb,* (now deceased), of Charlotte, N. C., *for Respondent, Ford Motor Company, in Reply, on contingent and alternative appeal,*

February 10, 1969.

BRAILSFORD, Justice.

On May 29, 1962, in the City of Rock Hill, seventeen-year-old Janet Mickle was a passenger in a 1949 Ford automobile, driven by Kenneth Hill. At the intersection of Jones Avenue and Black Street, this vehicle was in collision with an automobile driven by Larry Blackmon.

Janet was impaled on the gearshift lever, which entered her body behind the left armpit, penetrated to her spine, damaged the spinal cord at about breast level and caused complete and permanent paralysis of her body below the point of injury. She sued (1) Larry Blackmon, alleging negligence in the operation of his automobile, (2) Cherokee, Inc., a construction company which was engaged in widening Black Street, alleging negligence with respect to the removal of stop signs at the intersection and the failure to take proper precautions thereafter, and (3) Ford Motor Company, alleging negligence in the design and composition of the gearshift lever and of the knob or ball affixed thereto.

The trial resulted in an apportioned verdict for plaintiff against Cherokee, Inc., for $468,000.00 actual damages and against Ford Motor Company for $312,000.00 actual damages. The jury found no damages against Blackmon, and he is not a party to the appeal.

Cherokee moved unsuccessfully for judgment notwithstanding the verdict, for a new trial and for a new trial on after-discovered evidence and has appealed from the denial of these motions.

The circuit judge granted the motion of Ford Motor Company for judgment notwithstanding the verdict, and plaintiff has appealed. The court found no merit in Ford's alternative motion for a new trial, and Ford has filed a contingent and alternative appeal by which it seeks to preserve for review the grounds of this motion.

I

We first consider the sufficiency of the evidence, viewed in the light most favorable to the plaintiff, to establish actionable negligence on the part of Cherokee.

For some months prior to the day of the collision, Cherokee had been engaged, under a contract with the South Carolina Highway Department, in widening Black Street from 30 feet to 44 feet. On that day work had been in progress in the block south of the Jones Avenue intersection and in the intersection itself.

Jones Avenue was the through highway and was protected by stop signs facing traffic on Black Street. Preparatory to grading new radiuses at the intersection, a Cherokee employee removed these stop signs, at about 11:00 A.M., on May 29, 1962, according to his testimony and that of other witnesses for Cherokee, several days before, according to a witness for plaintiff.

At about 2:30 P.M., Kenneth Hill and Janet Mickle were traveling north on Jones Avenue toward the intersection. He was familiar with the route and knew that Jones Avenue

was the through highway. At the same time, Larry Blackmon approached on Black Street from the west. He had entered Black Street from Green Street after stopping at a stop sign facing Green Street traffic. Traffic at the next intersection was controlled by a signal light. There were stop signs facing all entrances at the next intersection, Spruce Street, referred to in the record as a four-way stop, and Blackmon stopped before entering. The next intersection, Stonewall, was only one block west of Jones Avenue. Here there were no stop signs facing Black Street, which, inferentially, was the through street.

As Blackmon approached Jones Avenue he observed that there was no stop sign facing him. He testified that he was unfamilar with the intersection and did not know that Jones Avenue was the favored highway. The usual construction signs were in place along Black Street and the fact that the roadway was under construction was otherwise evident. The stop signs were lying on the ground where they had been placed by Cherokee's employee. Inferentially, the grading had been completed at this intersection, and the motor grader had been moved to another location.

The two automobiles entered the intersection at approximately the same time [1] with the Hill vehicle on the right. The view was somewhat obstructed and neither driver saw the other until the collision was inevitable. Blackmon testified: "I got into the intersection and glanced up, and there was the Hill car. * * * I throwed on my brakes as fast as possible and swerved." Hill testified: "As I got into the intersection I happened to glance to my left and seen the Blackmon car headed my way. * * * (I)n a split second the Blackmon car hit me on the left." [2]

It is reasonably inferable from the testimony that the stop signs could have been replaced before the collision, as they

---

[1] The only testimony of eyewitnesses in point is that Hill entered the intersection first. However, no significant variation in speed is claimed, and it is conceded that the collision occurred in the center of the intersection.

[2] The right front of the Blackmon car struck the left front of the Hill vehicle.

were a short time afterward and before any additional work had been accomplished, or temporary signs could have been set up, or other means could have been employed to warn travelers on Black Street of their duty to stop before entering the intersection. But Cherokee took no measures to furnish such warning, nor did Cherokee attempt to warn travelers on the through highway that the stop signs were not in place.

It is also inferable that the absence of stop signs at this intersection created a deceptive situation in which the danger of a collision was greatly increased. It was for the jury to determine whether Cherokee was negligent in failing to take any precautions to warn motorists using the two streets of this hazard.

While it is argued in the brief that Cherokee was not guilty of negligence, the motion for a directed verdict at the trial did not challenge the sufficiency of the evidence in this respect. Instead, the motion rested upon an asserted lack of causal connection between the absence of the signs and plaintiff's injuries. This is also the point most strongly urged in the brief.

Section 46-421, Code of 1962, applies at intersections where neither stop signs nor other traffic control devices have been erected. A motorist approaching such an intersection is required to yield the right-of-way to a vehicle which has entered the intersection from a different highway; and, where two vehicles enter the intersection at approximately the same time, the driver of the vehicle on the left is required to yield to the vehicle on the right. Cherokee argues that the removal of the stop signs had no casual connection with the collision because, absent the signs, Blackmon was, nevertheless, required by the terms of this statute to yield the right-of-way. It is contended that Blackmon's negligence in failing to comply with this statutory duty [3] and in failing to exercise such care as to speed and

---

[3] In the light of *Eberhardt v. Forrester, infra,* 241 S. C. 399, 128 S. E. (2d) 687, Cherokee's reliance upon Section 46-421 appears to be misplaced.

lookout at an "uncontrolled intersection," as common prudence required, was, as a matter of law, the sole proximate cause of the collision. We disagree.

The jury could reasonably conclude that the absence of the stop signs was calculated to mislead a traveler on Black Street as to his duty at the intersection. We need not ignore the reality that jurors and judges, in common with other motorists, from almost universal usage, have learned to rely upon the presence of traffic control signs or signals at all save, perhaps, the least traveled intersections. Stop and go signal lights are constructed and located so as to be conspicuous to motorists on both intersecting highways. On the other hand, stop signs are designed and located so as to command the attention only of motorists on unfavored streets as they approach intersections with through highways. No corresponding signs are placed on favored highways to declare their status; and a stop sign on an unfavored highway is not conspicuous to a motorist on the intersecting highway, nor is the absence of such a sign conspicuous to him. Absent a traffic signal, a motorist approaching an intersection expects that traffic on one street will be controlled by a stop sign. The absence of one of these familiar and distinctive signs facing him is readily apparent and naturally suggests that one is in place on the intersecting street.

We held in *Eberhardt v. Forrester,* 241 S. C. 399, 128 S. E. (2d) 687, that the temporary absence of a stop sign does not alter the status of a preferred highway, and that a motorist on such highway, *unless he has knowledge of the absence of the sign,* is entitled to assume that a vehicle on the secondary highway will stop. On the other hand, a motorist on the secondary highway is not required to stop, except as otherwise required by the exercise of due care, if he does not have knowledge of the character of the through highway. Of course, a motorist, regardless of right-of-way, is required to keep a reasonably vigilant lookout on approaching an intersection.

A part of the risk created by Cherokee was that a motorist on Black Street, unfamiliar with the Jones Avenue intersection and not being confronted by a stop sign, would, whether negligently or not, enter the intersection with his vigilance blunted by the false appearance that Black Street traffic had the right-of-way. At the same time there was the risk that a motorist on Jones Avenue would enter the intersection relying upon the effectiveness of the stop sign which normally protected traffic on the through street. The jury was fully justified in concluding that these risks were realized because of Cherokee's negligent failure to guard against them, and that there was causal connection between Cherokee's negligence and plaintiff's injuries.

Cherokee urges as an alternative ground that the intervening negligence of Blackmon broke the chain of causation between its negligence, if any, and plaintiff's injury, so that its conduct became the remote cause rather than a proximate cause of such injury. The question is whether Cherokee's responsibility was superseded as a matter of law by the intervening conduct of Blackmon. This question must receive a negative answer.

The rule is firmly established that the intervening negligence of a third person will not relieve the original wrongdoer of responsibility if such intervention should have been foreseen in the exercise of reasonable care. "In such case the original negligence still remains active, and a contributing cause of the injury." *Woody v. South Carolina Power Co.,* 202 S. C. 73, 24 S. E. (2d) 121; *Mathews v. Porter,* 239 S. C. 620, 124 S. E. (2d) 321. "The wrongdoer may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his negligence." *Brown v. National Oil Co.,* 233 S. C. 345, 105 S. E. (2d) 81.

Here the intervention of third persons entering the intersection from different streets at the same time, or in dangerous proximity to each other, whether negligently or not, was foreseeable, at least the jury could so find,

and was the very hazard created by the removal of the stop signs. The realization of the risk created or substantially contributed to by a defendant's negligence, even though it involves the intervening negligence of another, can not soundly be held to supersede the defendant's responsibility, Prosser on Torts, 3d ed. at 312.

The following decisions from other jurisdictions tend to support our conclusion that the issue of proximate cause as to Cherokee was properly submitted to the jury. See *Irvin v. Padelford,* 127 Cal. App. (2d) 135, 273 P. (2d) 539; *Ferroggiaro v. Bowline,* 153 Cal. App. (2d) 759, 315 P. (2d) 446, 64 A. L. R. (2d) 1355; *Lyle v. Fiorito,* 187 Wash. 537, 60 P. (2d) 709; *Phinney v. City of Seattle,* 34 Wash. (2d) 330, 208 P. (2d) 879.

## II

Cherokee next contends that its negligence, if any, "could have contributed to the collision *only* through the actionable negligence of Larry Blackmon," whom the jury has exonerated. Citing *Chapman-Storm L. Corp. v. Minnesota-S. C. L. & T. Co.,* 183 S. C. 31, 190 S. E. 117, Cherokee urges that the verdict discharging the joint tort-feasor through whose sole agency the tort was committed operates to discharge all others. The cited decision turned on the master and servant relationship between the exonerated tort-feasor and his co-defendant. It has no application here. Cherokee was not sued on the theory that it was responsible for Blackmon's delict. The underpinning of the verdict against Cherokee was the jury's finding that Cherokee was guilty of actionable negligence. Blackmon's exoneration by the jury does not subvert it.

## III

At the conclusion of the evidence, counsel for Larry Blackmon made a series of motions to strike various specifications of negligence from the complaint. These motions were resisted by counsel for Cherokee, but counsel for plaintiff stated that they did not oppose them, and finally an-

nounced that they would not oppose the direction of a verdict for Blackmon. Again counsel for Cherokee objected, and the judge reserved his ruling. When the matter was again taken up, counsel for plaintiff requested permission to withdraw their consent to a directed verdict. This request was, in effect, granted, and the motion was overruled after certain specifications of negligence had been stricken, with the acquiescence of plaintiff's counsel.

Cherokee contends that by the foregoing conduct and by their comparatively friendly attitude toward Blackmon in argument to the jury, plaintiff's counsel accomplished his release as a joint tort-feasor. They invoke the ancient common-law rule that, regardless of the intention of the parties, the release of one joint tort-feasor releases all.

This technical, often criticized rule, which rests upon the fiction, among others, that a release implies a satisfaction, has been the subject of much litigation in other jurisdictions. Courts and legislatures have been astute to mitigate its impact. The decided trend of modern authority is that the release of one tort-feasor does not release others who wrongfully contributed to plaintiff's injuries unless this was the intention of the parties, or unless plaintiff has, in fact, received full compensation amounting to a satisfaction. Professor Prosser says that by virtue of statutes in some states and court decisions in others, this is the rule now actually applied in some two-thirds of the American jurisdictions. Prosser on Torts, 272 (3d ed.) See also Annotation, 73 A. L. R. (2d) 403.

No case in which this court has grappled with the problem has been cited, and we find none. We need not now either adopt or repudiate the controversial rule. We decline to give it novel application to the facts of this case, which do not involve a release from which the fiction of a satisfaction could be raised.

## IV

Cherokee's claim that the court erred in refusing its motion for a new trial upon the ground that the verdict was against the weight of the evidence raises no issue for determination here. Our jurisdiction in a law case is limited to the correction of errors of law; we have none to pass upon the weight of evidence. 1895 S. C. Const. Art. V, sec. 4.

## V

Cherokee seeks a new trial upon the ground that, in a number of instances during the examination and cross-examination of witnesses and in argument to the jury, plaintiff's counsel was guilty of prejudicial misconduct. Since this challenge to the verdict was not presented to nor passed upon by the trial court and is not included in any exception on this appeal, it is not properly before us. West's South Carolina Digest, Appeal & Error, Keys 169, 248.

## VI

Again adverting to the action of the court in striking from the complaint certain specifications of negligence against Larry Blackmon, Cherokee claims to have been prejudiced thereby, and excepts to the refusal of its motion for a new trial on this ground. Blackmon moved to strike all twelve specifications. The plaintiff resisted the motion as to six. The court refused to strike these, but, with plaintiff's acquiescence, granted the motion as to the other specifications. The ruling of the court was based upon the view that the state of the pleadings as between plaintiff and Blackmon was of no concern to Cherokee. We agree.

Cherokee had no right to insist that Blackmon be joined as a defendant in the first instance. *Doctor v. Robert Lee, Inc.,* 215 S. C. 332, 55 S. E. (2d) 68; nor did it have the right to insist that plaintiff go to the jury on all of its specifications of negligence against him. Cherokee's right to expound to the jury any view of the evidence tending to exculpate it and fasten the blame on

Blackmon was not impaired. While it is quite understandable that Cherokee would have opposed the motion, we find no error as assigned.

## VII

Cherokee claims error in the court's instructions to the jury in several particulars.

Evidence was presented at the trial from which the jury could have inferred that Blackmon, despite his contrary statement, did know that Jones Avenue was the through street and that a motorist on Black Street was required to stop before entering the intersection. As a convenient means of stating the first point argued by Cherokee, we quote from the brief:

"On the basis of this testimony and in reliance on the opinion in *Eberhardt v. Forrester,* 241 S. C. 399, 406, 128 S. E. (2d) 687, Cherokee .requested the Court to charge that 'if the defendant Blackmon had knowledge of the character of this intersection then the law required him to stop before proceeding, even though the sign is absent.' This the Court declined to do. * * *

"We submit that the requested charge was proper, that it related to a vital issue in the case, that its refusal was prejudicial and that the request had support in *Eberhardt v. Forrecter [Forrester], supra,* where the Court said:

" 'A motorist on a secondary highway is required to stop if he has knowledge of the nature of the preferred highway, even though the sign is absent, p. 406 [128 S. E. (2d) 687].' "

It was not error to refuse this request because the jury was fully instructed, in the language of the *Eberhardt* case, including the excerpt quoted from the brief, as to the duties of motorists when stop signs are temporarily down at the entrance to a through street or highway.

The same disposition must be made of the complaint that the court erred in failing to give the following instructions as requested:

"4. Even if a motorist is not familiar with an intersec-tion where a stop sign is temporarily absent, and therefore, is not required to stop, he may be otherwise negligent in failing to reduce speed, failing to keep a proper lookout, fail-ing to yield to another vehicle already in the intersection or which entered from the right at the same time he did, and if his negligence in any one or more of these respects was the sole or direct proximate cause of the collision, then he would be solely responsible, and no other party could be held re-sponsible."

The charge as a whole made it clear that the absence of the stop sign did not relieve either motorist of the duty to exercise due care on approaching and entering the intersection, and that Cherokee could not be held liable unless its negligence was a proximate cause of the collision. The jury was additionally instructed that Cherokee must be exonerated if it found that Blackmon's negligence was the sole cause of the collision, or if it found that the collision was caused by his negligence combining with the negligence of Hill or Ford. Since the substance of the requested instruc-tion was covered by the charge, there was no error in re-fusing it. West's South Carolina Digest, Key 260.

Cheorkee next argues that the court erred in charg-ing plaintiff's request No. 3 because the instruction made Cherokee responsible for all of the consequences of Blackmon's negligence, and relieved plaintiff of the bur-den of proving causation by the greater weight of the evi-dence. We need not quote the instruction, nor decide whether these criticisms are valid, because neither of the objections now urged was called to the attention of the court when, pursuant to Section 10-1210, Code of 1962, the jury was excused upon completion of the charge. See numerous deci-sions footnoted under this Code section, which hold that an exception to the charge will not be considered on appeal un-less the error was called to the attention of the trial judge.

The same disposition must be made of the challenge to an excerpt from the instructions on proximate cause, which

is the last question argued under this division of the brief. Any objection to the garbled language now complained of, which has the appearance of a slip of the tongue or reporter's error, was waived by failure to call it to the court's attention at the appropriate time.

## VIII

Counsel agreed upon the record for appeal with one exception. Plaintiff declined to print the closing argument of James P. Mozingo, III, Esquire, plaintiff's leading counsel, which was insisted upon by Cherokee and Ford. By agreement, this question was submitted to Judge Gregory, who ordered printed one excerpt from the argument, which alone was objected to by Ford at the trial. He declined to order printed the remainder of the argument, to which no objection was made by either defendant. Only Cherokee appealed and now asserts that since the exceptions question the propriety of the argument, it should have been printed. Whether any objection to the argument has been waived, quoting from the brief, "is a question for this Court and not a question for the Circuit Court in settling the case." The argument has appeal, but is not supported by the record, which does not include an exception by Cheorkee to Counsel's argument. Ford's exception No. 68, which charges that the Court erred in not restraining the argument, *ex mero motu,* can lend no strength to Cherokee's appeal from the order settling the case, and we find no error as assigned.

## IX

We next consider plaintiff's appeal from the order of the circuit court granting Ford's motion for judgment in its favor notwithstanding the verdict of the jury.

Plaintiff's case against Ford rests upon the claim that Ford was negligent in the design and placement of the gear-shift lever, which, without an adequate protective ball or knob, created an unreasonable risk of injury to a passenger upon the happening of a collision; and that this risk was realized when the protective knob shattered on the impact of plaintiff's body and she was impaled on the spear-like lever.

Ford, while defending the suitability of its gearshift lever assembly at the time of the production and initial sale of the car, disclaims any duty to manufacture an automobile in which it is safe to have a collision, or to exercise care to minimize the collision connected hazards presented to occupants by the design of the passenger compartment. Ford urges that its only duty in this respect is to manufacture a product which is free of latent defects and reasonably fit for its intended use, and that such use does not include colliding with other vehicles or objects.

Rapid development in the law of products liability following the celebrated decision in *MacPherson v. Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050, L. R. A. 1916F, 696 (1916), has resulted in general agreement upon the rule that a manufacturer is liable, under ordinary negligence principles, for a dangerously defective product which, while being put to an intended use, causes an accident and resulting injury to its user or to some third party. Ford concedes this principle, which we adopted in *Salladin v. Tellis,* 247 S. C. 267, 146 S. E. (2d) 875, and which has nigh universal support. Prosser on Torts, 661 (3d ed.)

On the other hand, there is scant authority on the specific issue which Ford tenders, *i.e.,* whether the manufacturer of an automobile owes a duty in the design and composition of his product to avoid creating unreasonable risks of injury to passengers in a collision of the automobile with another object. Stated differently, does the manufacturer owe a duty of care to reasonably minimize the risk of death or serious injury to collision victims who, quite predictably, will upon impact be forcefully thrown against the interior of the car or outside of it?

Whether Ford owed such a duty is a question of law. If not, plaintiff has no case against Ford. If so, whether Ford breached this duty to plaintiff's injury is a question of fact, unless, of course the evidence is susceptible of only one reasonable inference.

It is a matter of common knowledge that a high incidence of injury-producing motor vehicle collisions is a dread concomitant of travel upon our streets and highways, and that a significant proportion of all automobiles produced are involved in such smashups at sometime during their use. Thus, an automobile manufacturer knows with certainty that many users of his product will be involved in collisions, and that the incidence and extent of injury to them will frequently be determined by the placement, design and construction of such interior components as shafts, levers, knobs, handles and others. By ordinary negligence standards, a known risk of harm raises a duty of commensurate care. We perceive no reason in logic or law why an automobile manufacturer should be exempt from this duty.

The only two appellate court decisions in which this issue has been agitated and decided, which have come to our attention, reached opposed conclusions. Ford relies upon *Evans v. General Motors Corp.*, 359 F. (2d) 822 (7th Cir. 1966), in which plaintiff sued for the death of her intestate on the theory that the defendant was negligent in using an X frame in a 1961 Chevrolet station wagon, instead of the perimeter frame in general use, because, foreseeing the possibility of broadside collisions, the defendant owed a duty to provide side rails as reasonable protection against death or serious injury from such impacts. A divided court concluded that the complaint failed to state a cause of action. The rationale of the majority is fairly disclosed by the following excerpts from the opinion:

"A manufacturer is not under a duty to make his automobile accident-proof or fool-proof; nor must he render the vehicle 'more' safe where the danger to be avoided is obvious to all." (Citing *Campo v. Scofield*, 1950, 301 N. Y. 468, 95 N. E. (2d) 802, 804.) * * *

\* \* \* \* \* \*

"The intended purpose of an automobile does not include its participation in collisions with other objects, despite the

manufacturer's ability to foresee the possibility that such collisions may occur. * * *

"Defendant had a duty to test its frame only to ensure that it was reasonably fit for its intended purpose." 359 F. (2d) at 824 and 825.

It is apparent that the majority gave controlling weight to the concept of safety for the intended use or purpose as the limit of the defendant's obligation to exercise care. On the other hand, the dissent, applying elementary principles of the law of negligence, soundly, we think, found a duty to exercise care to furnish reasonable protection to collision victims in the statistical certainty that there would be such victims among the users of the cars produced and in the clear foreseeability of harm to such victims if care were not exercised.

In *Larsen v. General Motors Corp.*, 391 F. (2d) 495 (8th Cir.), decided March 11, 1968, a unanimous court adopted the view of the dissenting judge in *Evans*. The plaintiff, driver of a 1963 Chevrolet Corvair, was injured in a head-on collision by a rearward thrust of the steering shaft. The complaint alleged that plaintiff's injury was caused or aggravated by the defendant's negligence in extending the steering shaft to a point in front of the forward surface of the front tires, thus greatly increasing the rearward thrust of the shaft upon impact. General Motors again disavowed any "duty of care in the design of an automobile to make it more safe to occupy in the event of a collision." Relying upon the *Evans* decision and upon several intervening district court cases which had followed the *Evans* line, the district court sustained this position and granted summary judgment. In a well-reasoned and documented opinion, which analyzes the decisions relied upon by General Motors and other descisions tending to support the view adopted by it, the court of appeals reversed. We are convinced of the soundness of the following excerpt from the opinion, which demonstrates Ford's duty of reasonable care to avoid unreasonable risk of injury to collision victims:

"We think the 'intended use' construction urged by General Motors is much too narrow and unrealistic. Where the manufacturer's negligence in design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design. These injuries are readily foreseeable as an incident to the normal and expected use of an automobile. While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called 'second collision' of the passenger with the interior part of the automobile, all are foreseeable. Where the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its products to an unreasonable risk of injury, general negligence principles should be applicable. * * *" *Larsen v. General Motors Corp.*, 391 F. (2d) at 502.

The facts in *Ford Motor Co. v. Zahn*, 265 F. (2d) 729 (8th Cir.), are more nearly analogous to those in *Evans*, *Larsen* and here than those in any other appellate decision which has come to our attention. Plaintiff, while a passenger in a Ford car, was thrown forward by the driver's emergency application of brakes. His head slammed against the dashboard, and he lost an eye which, inferentially, was penetrated by a sharp protruding corner of an ashtray. The defect in the ashtray occurred in the manufacturing process rather than in design and, to this extent, the facts are distinguishable from those in *Larsen* and *Evans*. Nevertheless, the allowance of recovery was based upon the court's recognition of the manufacturer's duty to exercise care to avoid unreasonable risks of injury to passengers who should be thrown against the dashboard by deceleration of a car. The manufacturer's knowledge that emergency decelerations

are of frequent occurrence in highway travel, in short, the foreseeability of the risk, was pointed to as the basis of the duty. This is, of course, the rationale of *Larsen,* which we adopt.

We shall not rehash the other decisions, pro and con, which are reviewed in *Evans* and *Larsen.* None of them is on strictly analogous facts. However, we can not omit reference to the persuasive opinion by Judge J. Spencer Bell in *Spruill v. Boyle-Midway, Inc.,* 308 F. (2d) 79 (4th Cir. 1962). Although the product involved was poisonous furniture polish, which was ingested by an infant while his mother was temporarily out of the room, the cogent grounds of the court's rejection of the claim that the manufacturer was not liable because the product was not intended to be consumed are, in part, fully applicable here, quoting:

"We agree with the general principle but the application the defendants would have us make of it here is much too narrow. *'Intended use' is but a convenient adaptation of the basic test of 'reasonable foreseeability'* framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence. 'Intended use' is not an inflexible formula to be apodictically applied to every case. Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

"*However, he must also be expected to anticipate the environment which is normal for the use of his product* and where, as here, that environment is the home, he must anticipate the reasonably foreseeable risks of the use of his product in such an environment. These are risks which are inherent in the proper use for which his product is manufactured. * * *" (Italics added.) 308 F. (2d) at 83-84.

We can add nothing to the force of Judge Bell's logic and will not attempt to do so. It is notable that the above quotation may be shaped to our facts by simply substituting the

word "highway" for the word "home" in the first sentence of the second paragraph.

## X

Having resolved the legal question of Ford's duty to exercise care in plaintiff's favor, we now examine the sufficiency of the evidence to support the jury's factual finding that there was a breach of that duty. Of course, the evidence and all inferences to be drawn therefrom must be viewed in the light most favorable to plaintiff.

The 1949 Ford was equipped with a manual transmission. The gearshift lever was mounted on the right of the steering shaft below the wheel. It was a slender, cylindrical, steel rod about 12 inches in length, with a slight taper to a diameter of 5/16 of an inch at the end on which a plastic knob or ball was mounted. This rod protruded some two inches beyond the rim of the wheel and was pointed generally in the direction of a passenger on the right side of the front seat. In high or third gear the lever was pointed downward toward the seat. Without an adequate protective knob, the lever was quite capable of piercing the body of any person who might be thrown upon it, and the jury could reasonably have concluded that the rod presented an unreasonable risk of injury unless effectively guarded.

The end of the gearshift lever was covered by a knob or ball of a plastic material manufactured by Tennessee Eastman Company of Kingsport, Tennessee, labeled tennite butyrate, also referred to in the record as acetate butyrate. The ball was moulded by Ford in two hollow sections, the bottom section with a hole slightly smaller in diameter than the end of the lever. The two sections were glued together and the slightly heated ball was force-fitted over a series of annular groves around the end of the rod. This resulted in a firm, permanent attachment. The knob could not be removed without rupturing it.

The plastic material was available in a wide range of colors, including black. Ford chose to use white tennite

butyrate for the knobs in its 1949 model. Exposure to the ultraviolet rays of sunlight caused this material to deteriorate. Carbon, which is the coloring agent used to produce black tennite butyrate, is highly resistant to ultraviolet rays. Ford switched to black butyrate for the knobs in its 1950 model. After exposure to sunlight for an undertermined length of time, the greater the exposure the more rapid the deterioration, the white knobs became crazed. Hairline cracks which developed on the surface in this process destroyed the force distributing quality of the plastic knob and caused it to shatter easily on impact. After developing these cracks, a 1949 white ball was of no value as a protective guard but remained serviceable as a knob. The presence of the hairline cracks was apparent on visual inspection. However, their deteriorating effect would not necessarily be comprehended by a person of ordinary reason. The black 1950 balls never developed these cracks. Rigidly attached to the gearshift lever, they were not subject to wear, as are moving parts of machinery, and there is no evidence that the black knobs deteriorated with age or normal use.

When questioned about the expected life of the material furnished to Ford for the 1949 knobs, an Eastman expert testified: "That is a hard question to answer because it is dependent on the type of exposure, but, generally speaking, I think it would be expected to last six or eight years without any question. More if it had less exposure to ultraviolet." However, accompanying detailed specifications furnished to the users of this material by its producer was a statement of its general characteristics, including the following: "Articles moulded from this formula are generally commercially unaffected by 12 or more months of continuous outdoor exposure."

Ford knew that the white plastic from which the 1949 gearshift ball was moulded would deteriorate on exposure to the sun's rays, and counsel disclaims that the ball was attached to the lever as a safety device.[4] Without regard to

---

[4] Inferentially, the witness who estimated the life of the material at six to eight years was referring to its usefulness as a knob rather than as a protective guard.

the reason for affixing the ball, however, counsel argues that the burden was on plaintiff to prove that the assembly was "unreasonably dangerous at the time this automobile was first sold." Counsel urges that the absence of evidence "that this knob would have shattered if this impact had occurred in 1949, 1950 or subsequent thereto during the normal life expectancy of this plastic material," results in a failure of proof.

It is implicit in the verdict that the gearshift lever presented an unreasonable risk of injury if not adequately guarded. At the time of plaintiff's injury the knob on the Hill car continued to serve its functional purpose as a handhold, but it had become useless as a protective guard. It is inferable that the condition of the knob did not arise from ordinary wear and tear, but from an inherent weakness in the material of which Ford was aware when the selection was made. In the light of the insidious effect on this material of exposure to sunlight in the normal use of an automobile, it could reasonably be concluded that Ford should have foreseen that many thousands of the one million vehicles produced by it in 1949 would, in the course of time, be operated millions of miles with gearshift lever balls which, while yet serving adequately as handholds, would furnish no protection to an occupant who might be thrown against the gearshift lever. The jury could reasonably conclude that Ford's conduct, in manufacturing a needed safety device of a material which could not tolerate a frequently encountered aspect of the environment in which it would be employed, exposed many users of its product to unreasonably great risk of harm. Therefore, the issue of Ford's negligence was submissible under elementary common law principles, unless other considerations relied upon by Ford require a different conclusion.

Ford urges that the judgment in its favor should be affirmed because (1) there was no defect in the gearshift lever and knob when the automobile left the hands of the manufacturer; (2) Ford is not liable for an injury caused by

the deterioration of the knob after thirteen years' use; (3) Ford is not liable for an injury caused by deterioration of the ball which was obvious and known to the owner and user of the automobile; (4) Ford is not liable because the release of Blackmon by the verdict of the jury broke the chain of causation between any wrongful act of Ford and plaintiff's injuries.[5]

## (1) & (2)

In a products liability case against the manufacturer, plaintiff does, of course, have the burden of establishing that the defect complained of existed at the time the product was sold by the defendant. "There is no duty on a manufacturer to furnish a machine that will not wear out." *Auld v. Sears, Roebuck & Co.,* 261 App. Div. 918, 25 N. Y. S. (2d) 491, aff'd, 288 N. Y. 515, 41 N. E. (2d) 927. We subscribe to the following statement of the law which is applicable to the facts of this case:

"If the chattel is in good condition when it is sold, the seller is not responsible when it undergoes subsequent changes, or wears out. The mere lapse of time since the sale by the defendant, during which there has been continued safe use of the product, is always relevant, as indicating that the seller was not responsible for the defect. There have been occasional cases in which, upon the particular facts, it has been held to be conclusive. It is, however, quite certain that *neither long continued lapse of time nor changes in ownership will be sufficient in themselves to defeat recovery when there is clear evidence of an original defect in the thing sold.*" (Emphasis added.) Prosser on Torts, 667 (3d ed. 1964).

*Lynch v. International Harvester Co. of America,* 60 F. (2d) 223, 224 (10th Cir.), involving five years' continuous use of a threshing machine, was one of the cases holding that protracted safe use of a product was conclusive against liability of the manufacturer. Some years later, this case was

---

[5] This statement of Ford's contentions has been formulated from the questions stated in the brief, respectively, in the order IV, I, II, V. Ford's question III has been disposed of.

overruled by the court which decided it. See *Pryor v. Lee C. Moore, Corp.,* 262 F. (2d) 673 (10th Cir. 1958), in which the mast or derrick of a drilling rig collapsed under ordinary strain after fifteen years of satisfactory service. The mishap was caused by the failure of a weld at the foot of one leg of the derrick, which, according to expert testimony, indicated that the weld had not been properly fused at the point of failure. The court, after reviewing a number of decisions refusing to foreclose liability as a matter of law after prolonged safe use of a product, stated:

"The proposition that prolonged safe use bars any inference of negligent manufacture has not gained wide acceptance in the application of the MacPherson doctrine. * * * Certainly no firmly established body of tort law has grown up around it. A reappraisal of the problem in the light of subsequent decisions persuades us to recede from the rule in Lynch, and to hold that prolonged use of a manufactured article is but one factor, albeit an important one, in the determination of the factual issue whether the negligent manufacture proximately caused the harm." 262 F. (2d) at 675.

There was no evidence in *Pryor* that the weld could not withstand the strain of the drilling operation when the rig was first sold by the manufacturer. The contrary plainly appears from fifteen years' safe use. However, this did not bar submission of the issue of liability to the jury when there was other evidence tending to establish that the ultimate collapse was caused by the manufacturer's failure to properly fuse the weld.

In *Darling v. Caterpillar Tractor Co.,* 171 Cal. App. (2d) 713, 341 P. (2d) 23, plaintiff was injured when the hinge on the inspection plate in the deck of a bulldozer, because of a defective weld, broke off under his weight. The bulldozer had been in hard use for about three years. Inferentially, the inspection cover had been stepped upon many times by various operators. There was undisputed expert testimony that the weld was defective, that it did not fail suddenly, but that

"it failed gradually over a considerable period of time." In response to the manufacturer's claim of immunity from liability by proof of protracted safe use, the court said in part:

"The hinge in question was not a moving part that was subject to wear and strain while the machine was in operation. It was not a hinge that had been properly and efficiently welded to the deck plate and the inspection cover which gave way as a result of long continued use; it was a part that was defective in construction and which gave way as a result of use which would not have caused it to fail if it had been properly and efficiently constructed." 341 P. (2d) at 29.

In *Fredericks v. Farrington*, 227 F. (2d) 450 (2d Cir. 1955), an iron support under a skid used in unloading vessels broke after two and one-half years of safe use and "normally rough handling." In this suit against the fabricator of the iron there was expert testimony that a faulty design created a "stress raiser" or "localizer," because of which the metal eventually cracked and ruptured. In dealing with the protracted safe use objection to recovery, the court said:

"The mere passage of time confers no immunity upon a negligent wrongdoer; but it has relevance to the likelihood, depending upon the circumstances of a particular case, that deterioration due to use, perhaps accelerated by misuse, will be mistaken by a jury for a defect due to negligent manufacture or fabrication. On the evidence before us in this case, we cannot say the jury went beyond permissible and rational inference in attributing the accident to Farrington's negligent fabrication of the skid iron, which cracked and came apart, despite at least two and one-half years of apparently safe use and normally rough handling. * * *" 227 F. (2d) at 452.

The above excerpt from *Fredericks* was quoted with approval in *Carney v. Sears Roebuck & Co.*, 309 F. (2d) 300, 305 (4th Cir.), in which plaintiff was injured by the

collapse of a ladder after fifteen months' use, and there was evidence that a defective rivet gave way under continued strain to cause the collapse.

Here, as in the cases just referred to, there was evidence of an original weakness in the gearshift assembly which caused the collapse of the protective knob. The deterioration of the product and its consequent failure was the very risk created by the negligent choice of material, or the jury could so find. The rule relied upon, that a manufacturer is not liable for the failure of a product due to deterioration from ordinary wear and tear or misuse, simply does not fit these facts.

We readily concede that the passage of thirteen years between the marketing of a product and its injury-producing failure is a formidale obstacle to fastening liability upon the manufacturer. However, it may reasonably be inferred in this case that the advanced age of the ball was coincidental with its failure rather than the cause of it, and the knob would have shattered upon a comparable impact had it occurred much earlier in the life of the car. The important inquiry is not how long the knob lasted but what caused its failure. Mere passage of time should not excuse Ford if its negligence was the cause. Since this conclusion finds support in the evidence, the issue was for the jury.

### (3)

Since the condition of the knob was obvious and was known to the owner and user of the automobile, Ford contends that it is relieved of responsibility for plaintiff's injuries on either of two theories. First, there was no latent defect; and, second, Hill's negligence in failing to replace the knob was an intervening cause which broke the chain of causation between Ford's negligence, if any, and plaintiff's injury. A number of decisions are cited which apply one or the other of the theories relied upon to their respective factual situations. On the facts of this case, these decisions are not persuasive that the issue of liability should have been resolved in Ford's favor by the court, and we shall not review them.

The first theory may be disposed of by pointing out that there was no proof that young Hill knew that the knob had become worthless as a protective guard, or even that he realized its importance for that purpose. The knob was intact. It covered the end of the protruding lever. It could be turned or spun around, but it would not come off. The hairline cracks were in the surface of the material and did not expose the hollow interior of the knob or reveal its fragility. The danger lurked in the combination of the steel rod and nonresistant ball and was concealed rather than obvious.

The second theory is likewise unsound. Assuming, without deciding, that Hill was negligent in not replacing the knob, such negligence would not be a superseding cause if it was reasonable foreseeable. West's South Carolina Digest, Negligence, 62(3). At best from Ford's standpoint, the foreseeability of such conduct was for the jury.

(4)

Ford joins Cherokee in claiming that the verdict exonerating Blackmon, without whose negligence no injury could have been sustained, releases all defendants, and in equating plaintiff's conduct with relation to Blackmon to the release of one joint tort-feasor releasing all. For the reasons stated in parts II and III of this opinion, disposing of Cherokee's similar claims, there is no merit in these contentions.

We, therefore, conclude that the court erred in granting Ford's motion for judgment notwithstanding the verdict, and we proceed to consider Ford's alternative appeal by which it seeks a new trial on sixty-eight exceptions, grouped and argued under seven questions.

XI

Ford charges error in the instructions given and refused with respect to its duty in the design of the automobile and its gearshift lever assembly. While the argument is principally founded upon the rationale of *Evans v. General Motors*

*Corp., supra,* 359 F. (2d) 822 (7th Cir. 1966), which we have rejected, it is quite sufficient to challenge the correctness of the instructions under the view of the law which we have embraced.

In comparatively recent years, a very considerable ██ ██ body of law has been built up concerning the liability of the manufacturer or other supplier of various products for injuries caused thereby. In the vast majority of these cases some defect in the design or fabrication of the product has actually caused the injury-producing accident, or some ingredient of the product has caused harm to a user. This is not such a case. The negligence charged to Ford did not cause or contribute to the intersectional collision between the Hill and Blackmon automobiles. The record indicates that the 1949 Ford was in good mechanical condition and fit to operate. The issue for the jury was whether Ford in the design and selection of materials for the gearshift lever assembly negligently created an unreasonable risk of enhanced injury to passengers in a collision situation, which, at best, is fraught with peril to life and limb. We think that the trial judge fell into error by giving instructions, apparently paraphrased from other products liability decisions or treatises, which were inappropriate to this issue.

The court charged the jury at plaintiff's request:

No. 5. "The manufacturer of an automobile, if the automobile is made under a plan or design which makes it dangerous for the uses and purposes for which it is intended, is subject to liability to those whom he should expect to use the automobile for bodily injury proximately resulting from the manufacturer's failure to use reasonable care in adopting a safe plan or design of the vehicle."

No. 14. "The duty of a manufacturer to use reasonable and due care in the adoption of a plan or design for his product includes the duty to design the product so that it will fairly meet any emergency use of the product which can reasonably be anticipated at the time of the planning or designing of the product."

Plaintiff correctly states that request No. 5 is a paraphrase of Sec. 398, Restatement of Torts (2d). But this section was formulated to express the supplier's duty in cases where the defective product has caused the injury-producing accident. It does not correctly state the duty of an automobile manufacturer with respect to the design of the passenger compartment so as to avoid unreasonable risks of collision produced injuries. In this field there is no *safe* plan or design; hence, no duty to adopt one. As applied to this case, the "emergency use" requirement of request No. 14 is equally objectionable. In this setting the phrase necessarily comprehends a collision, and an automobile can "fairly meet" such an emergency only by securing its occupants from harm. This instruction has been used, perhaps appropriately, in other types of products liability cases, but it is manifestly erroneous when applied to plaintiff's cause of action against Ford. The duty of care applicable to this case was to take reasonable precautions in the light of the known risks, balancing the likelihood of harm, and the gravity of harm if it should happen, against the burden of feasible precautions which would tend to avoid or minimize the harm. 2 Harper and James, The Law of Torts, Sec. 28.4 (1956).

It is of the essence of this controversy that Ford's product proved to be unsafe for occupancy by plaintiff on the occasion in question. The primary issue for the jury, on which Ford's liability turned, was whether the collision risk to which she was subjected by the design and composition of the gearshift lever assembly was unreasonable. The quoted instructions were misleading and failed to properly submit this issue. It is suggested that any error in this respect disappears when the charge is considered as a whole. We think, instead, that the error was compounded by other instructions along the same line. For example, the court instructed the jury:

"A manufacturer performs its duty as to design so far as the safety of the manufactured article is affected by its design when the manufactured article is safe for the use for which

it is intended. This duty includes the duty to design the product so that it will fairly meet any emergency of use which can be reasonably anticipated by the manufacturer, that is, of course."

Under this subdivision of the brief, Ford also charges error in giving plaintiff's requests to charge No. 6 and No. 7 and in refusing Ford's requests No. 30 and No. 31. We think that plaintiff's requests 6 and 7 were irrelevant to the issues properly submissible to the jury, and that they should have been omitted. We need not decide whether giving these instructions constituted reversible error. We think that Ford's request 30 and 31 were properly refused because, without appropriate qualifications, they would have tended to mislead the jury. It would serve no useful purpose to quote these requests.

Several exceptions complain that the court erred in submitting to the jury an issue as to how long the gearshift knob should have been expected to last. We need not pass upon these exceptions. The principles stated under part X, (1) and (2), of this opinion should guide the trial judge in shaping instructions in the event of a retrial.

Error is charged in the failure of the court to instruct the jury that the defendant would not be liable to the plaintiff for patent and known defects in the vehicle. Under the facts of this case, such an instruction would have been error for the reasons stated in part X (3) of this opinion. Furthermore, there was no evidence that plaintiff was aware of the condition of the knob, and no issue as to contributory negligence or assumption of the risk was raised by the pleadings.

Finally, as to the instructions, Ford charges that the court erred in granting plaintiff's request No. 9, as follows:

"A manufacturer of a product who knowingly sells or furnishes an article which, by reason of negligent design, is imminently dangerous to life or body, is liable to any person

who suffers injury therefrom if the manufacturer failed to give reasonable notice or warning of the defect or danger."

While this proposition might be sound on appropriate facts, its inapplicability to this case is demonstrated by the practical impossibility of an effective manufacturer's warning to a casual passenger in a thirteen-year-old automobile. The giving of this instruction was error which, at least, in combination with other errors in the instructions, requires a new trial.

## XII

Ford claims that a new trial should be awarded because plaintiff, in practical effect, was permitted to cross-examine her own witnesses. This has reference to the activity of counsel for the defendant Blackmon in cross-examining witnesses for plaintiff in a way "designed to amplify and bring forth testimony favorable to the plaintiff and harm to the defendant Ford." The record does not indicate that appropriate objections were made at the trial to the role assumed by counsel for the defendant Blackmon. Therefore, the exception raising this issue may not be sustained.

## XIII

Some twenty odd exceptions to the admission in evidence of exhibits and of testimony are argued in Ford's brief under five subdivisions, but only in the most general way. We adopt the headings employed in the brief.

(1) *Admission of unidentified products.*

The principal arguments under this subdivision is that certain gearshift lever devices, photographs of such devices and a portion of a 1941 Chevrolet steering system should have been excluded from evidence because they were not sufficiently identified or traced to the source. We do not find that these exhibits were objected to on this ground at the trial.

### (2) *Irrelevant testimony of "safer construction."*

The argument here is that testimony by an expert witness for plaintiff as to what would have made the gearshift assembly "safer" was irrelevant, because "the question is not what would be safer; the question is the adequacy of the device actually employed by Ford * * * whether the device as made by Ford was unreasonably dangerous." We think that the testimony complained of was relevant to the issue of whether the risk of harm to a passenger was unreasonable.

### (3) *Irrelevant testimony as to the position of the shaft and wheel.*

Ford contends that this testimony was irrelevant because the complaint did not allege negligence with respect to the protrusion of the shaft beyond the rim of the wheel. The same contention is made with respect to certain testimony as to the feasibility of breakway devices. We have searched the record with care and do not find that an objection on this ground was made to the testimony at the trial.

### (4) *Irrelevant testimony concerning Air Force activities.*

The witness Moore, an expert on crash injuries and their causes in both the automotive and aircraft fields, was permitted to testify as to studies made and programs carried out by the United States Air Force in the early 1940's for the purpose of reducing injury-producing objects in aircraft cockpits. The witness testified that the same principles are applicable to the passenger compartment of an automobile. The *desideratum* in both instances is, and has been, to eliminate as far as possible sharp protrusions or angles upon which a passenger might be hurled upon impact, and which cause serious injury by producing "high localization of force." In the words of the witness: "The human body is moving in this package at the same speed the package is going when the package stops moving, and it keeps right on going in that same speed until it hits something to stop it.

When it hits this thing ahead of it which stops it, if it is straight and narrow, it is producing a very, very highly localized force. It is stopping on that tiny, little point, and it will go through."

Ford's objection to this testimony was upon the ground that the witness should confine his testimony to the automobile industry. We do not necessarily approve of the admission of all of the testimony of this witness. However, we do not think that the testimony as to the Air Force crash injury program as a whole was irrelevant. Certainly, its admission was within the discretion of the trial judge.

(5) *Irrelevant and incompetent reference to printed documents.*

The witness Moore testified that in the 1930's and 1940's articles were published in leading scientific journals concerning the causes of crash injuries. He was permitted, over Ford's objection, to name the author and give the title of each article, but he was not permitted to make any statement as to the contents. Ford argues that the admission of this testimony violated the best evidence rule and that it was hearsay. We perceive no basis for the latter objection and conclude that the former is unsound. 4 Wigmore, Evidence, Sec. 1242 (3rd ed. 1940).

## XIV

We now reach the issue of the claimed excessiveness of the verdict. Both Cherokee and Ford urge that the sum of the verdicts for actual damages, $780,000.00, is so grossly excessive as to require a new trial and except to the trial judge's contrary conclusion.

The assessment of actual damages in a case of grievous and permanent personal injury is a task beset with great difficulty, which the law has entrusted to the judgment and discretion of a jury of twelve men, subject to the supervisory power of the trial judge over verdicts. Where the trial judge has placed his stamp of approval upon

a verdict, there is no remedy in this court for mere excessiveness. We have no jurisdiction to review issues of fact in a law case. We may reverse only in those extreme cases in which the amount awarded is so shockingly disproportionate to the injuries as to bring conviction that the jury was actuated by caprice, prejudice or other considerations not founded upon the evidence. Manifestly, a verdict which may be supported by any rational view of the evidence, or as to which reasonable and disinterested men might draw different inferences, is not of this class. Our limited appellate jurisdiction in law cases authorizes review only when the case is free from doubt, the evidence admitting of only one reasonable inference, so that error in the circuit court's refusal of relief from an excessive or inadequate verdict may be said to be one of law rather than of fact. *Jennings v. McCowan,* 215 S. C. 404, 55 S. E. (2d) 522, 532; *Duncan v. Record Pub. Co.,* 145 S. C. 196, 143 S. E. 31, 59; *Union Bleaching & Finishing Co. v. Barker Fuel Co.* 124 S. C. 458, 117 S. E. 735.

This case was presided over by an able and experienced trial judge, now a justice of this Court. He recognized that the verdict is a very large one, "probably the highest verdict in a personal injury case in the history of this State." However, after reviewing and analyzing the evidence as to plaintiff's injuries and their consequences, which he referred to as the most serious to confront him in seventeen years on the trial bench, he concluded that the verdict was not disproportionate to the harm suffered by plaintiff. He, therefore, refused to interfere with the verdict, either by granting a new trial or by reducing the award by an order *nisi.* We quote the judge's careful evaluation of plaintiff's injuries, the fairness of which is not challenged on the basis of the trial record:

"The injuries to the plaintiff in this case are horrible and are permanent. There is no hope for the future. There is no possibility of improvement. In the wreck she was impaled

upon the gear shift lever of the automobile in which she was riding. The puncture penetrated into the upper thoracic spine, fracturing a vertebra, and causing a part of the fractured bone to be pushed against the spinal cord. Immediate and permanent paralysis of the body below the point of the injury occurred. Unfortunately, the point of the injury was at the upper chest level, so that not only are the lower limbs paralyzed but her entire body below the upper chest level is affected. The plaintiff is unable to walk or stand and this condition is permanent. The paraplegia is so complete that she is unable to sit in a wheelchair without being strapped or braced to prevent slumping. She has no control over her bladder or bowels or over any movement of any part of her body below the upper chest level. She has been plagued with kidney infection and with spasms of the muscles in the lower part of her body. These spasms cause substantial movement of the legs, cause the legs to be spastic at times, and are uncontrollable. An extended attempt was made at rehabilitation, including the attempt to use leg braces, but these attempts were unsuccessful. The paralysis occurred just below the point of the fracture of the spine, and the deadness and paralysis of the body occurred below the point of the injury; however, she has continued to suffer pain at and above the fractured point. The plaintiff is helpless to take care of herself and cannot even get in and out of bed or out of the wheelchair without assistance. Her bladder discharges without control approximately every two hours during the day and night. Her bowels discharge at uncontrollable times and without notice to the plaintiff. The record shows that it will be necessary to have someone continuously with the plaintiff. In case of fire or other emergency, or in case she should fall out of the wheelchair, she would be unable to help herself.

"The plaintiff, Janet Mickle, was seventeen years of age at the time of the wreck. Plaintiff's mother and father are doing the best that they can to care for her now on a twenty-four hour basis. However, plaintiff's mother is thirty-two

years older than the plaintiff and her father is thirty-eight years older than she. The record indicates that the plaintiff's life will not likely be shortened by the injuries, and that she should live out a normal life expectancy in this condition. It, therefore, appears that for a period of thirty to thirty-five years of her life she will be without the presence and the help of either her mother or her father. The record shows that the plaintiff would not need the care of a registered nurse. However, the present rate of pay for practical nurses which she does and will need, is fourteen ($14.00) dollars for an eight-hour shift. Over a period of thirty-two years, after the death or disability of her parents, and assuming no increase in the rate of services for practical nurses, it would cost the plaintiff $458,560.00 just to provide practical nursing care for herself.

"Prior to the injury to the plaintiff she was very active, very athletic and enjoyed a good social life. She enjoyed swimming, bowling, dancing and anything that was athletic. Now she is able to pull out the knob on the television set and she can talk on the phone. However, she will have muscle spasms causing her to even drop the phone at times when she attempts to use it. In addition to the extensive physical damage suffered, serious mental depression has occurred and contines to be present. Spasms in her body often cause shortness of breath and difficulty in breathing.

\* \* \*

"The injuries suffered by the plaintiff in this case occurred some three years prior to the time of the trial of this case. Certainly her past accumulated damages over the period of these three years were very substantial. In addition to this she has a life expectancy of some fifty years.

"I do not consider that the verdict in this case was given as the result of passion, prejudice or caprice. The jury impressed me as intelligent and sincere, and the amount of their verdict is amply supported by the record in this case."

We face the narrow question of whether the court's refusal of a new trial was error of law, that is, whether the conclusion reached was without support in the evidence, or was opposed to the *only* reasonable inference which could be drawn therefrom. However much any member of this court might disagree with the conclusion reached by the trial judge in the exercise of his discretion, we can not say that his view of the case is without support in the evidence or opposed to the only reasonable conclusion to be drawn therefrom. Hence, there was no error of law in denying the motions for a new trial on this ground, and these exceptions must be overruled. We close this division of the opinion with a quotation from *Steele v. Atlantic Coast Line Railroad Company,* 103 S. C. 102, 87 S. E. 639:

"Under the Constitution and statutes, the discretion to control juries in respect to the amount of their verdicts in actions for damages is vested in the trial judges, who, it must be presumed, recognize and appreciate their responsibility, and exercise the discretion vested in them with fairness and impartiality. This court has no jurisdiction to review matters of fact in an action at law; and, therefore, unless a verdict is wholly unsupported by evidence, or is so excessive as to justify the inference that it was capricious, or influenced by passion, prejudice, or other considerations not found in the evidence, * * * the responsibility for failure to reduce it must rest upon the trial judge. * * *" 103 S. C. at 117-118, 87 S. E. at 644.

## XV

As a surprising sequel to this extraordinary case, subsequent to the trial, plaintiff married a young man of like age and on May 31, 1967, without any ill effects to herself, gave birth to a normal baby girl. Upon learning of these facts, Cherokee petitioned for a new trial on after-discovered evidence. The petition avers that these developments were inconsistent with the medical testimony at the trial, as summarized by the trial judge in his order denying a new trial, and urges that had the jury known of plaintiff's

ability to bear a normal child without injury to herself, the amount of damages awarded would have been materially affected. Cherokee appeals from an order of the circuit court denying this petition.

We find no merit in the appeal. The statements of two physicians, one of them plaintiff's obstetrician, show that paraplegia does not incapacitate a woman from childbearing, and that this has been a well-documented medical fact for many years. The prognosis that plaintiff's disability is permanent has not changed, and no claim was made at the trial that she was incapable of bearing a child. It is not apparent how knowledge at the trial that plaintiff was physically capable of bearing a child could have advantaged Cherokee in the assessment of damages. The fact that this capacity existed, and has now been realized, is not inconsistent with the testimony at the trial and is not sufficient ground for a new trial.

Affirmed as to Cherokee, Incorporated, reversed and remanded as to Ford Motor Company, Incorporated.

Moss, C. J., and BUSSEY, J., concur.

LEWIS, J., and LIONEL K. LEGGE, Acting Associate Justice, dissent in part.

LEWIS, Justice (dissenting):

While I agree that the judgment against Cherokee should be affirmed and that the judgment entered in Ford's favor notwithstanding the verdict should be reversed, I do not agree that a new trial should be ordered. To that extent, I dissent from the main opinion. The verdict of the jury against both Cherokee and Ford should be sustained.

The main opinion, following general negligence principles, soundly holds that a "manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." *Larsen v. General Motors Corp.,* 391 F. (2d) 495, 502. The opinion also correctly states that "the primary

issue for the jury, on which Fords' liability turned, was whether the collision risk to which she (plaintiff) was subjected by the design and composition of the gearshift lever assembly was unreasonable."

After so holding, the main opinion then declares erroneous and prejudicial the following instructions as the sole basis for granting a new trial to Ford:

No. 5. "The manufacturer of an automobile, if the automobile is made under a plan or design which makes it dangerous for the uses and purposes for which it is intended, is subject to liability to those whom he should expect to use the automobile for bodily injury proximately resulting from the manufacturer's failure to use reasonable care in adopting a safe plan or design of the vehicle.

No. 14. "The duty of a manufacturer to use reasonable and due care in the adoption of a plan or design for his product includes the duty to design the product so that it will fairly meet any emergency use of the product which can reasonably be anticipated at the time of the planning or designing of the product."

As I interpret the main opinion, it holds that the foregoing instructions were in error because they erroneously imposed a duty on Ford to adopt a safe plan or design of the passenger compartment of its vehicle so as to *secure* its occupants from harm in the event of a collision, reasoning that "in this field there is no *safe* plan or design, hence, no duty to adopt one." It is further reasoned that the charge was erroneous because the duty of Ford in designing the vehicle was not to fairly meet an emergency use, such as a collision, but only to so design the product as to avoid subjecting the users to an unreasonable risk of injury in the event of a collision.

It is elementary that a charge to the jury must be considered as a whole and particular instructions are to be construed in context with the remainder of the charge on the same question.

In addition to the instructions in question and in connection therewith, the trial judge instructed the jury that "a manufacturer is not an insurer" of the safety of his product; that he "has no duty to produce a product incorporating only features representing the ultimate in safety"; that "a manufacturer is not under a duty to make a machine, or its component parts, accident proof or fool-proof"; that "the law holds a wrongdoer responsible in damages only for the natural and probable results of his wrongful acts, and for the injurious effects thereof which he might have reasonably foreseen"; that "the manufacturer of an article or product, such as an automobile, owes a duty of *reasonable care* to the consuming public to furnish a product which is *reasonably safe* for the uses and purposes for which it is intended"; that the jurors were not free to substitute their opinion for that of the manufacturer "as to what would be a better or safer design unless you first find that the design employed by the manufacturer and the materials used by it were reasonably certain to put life or limb in peril in the normal use of the product"; and that "the liability of the manufacturer can be established only by showing that the device which it sold was inherently dangerous in that it was likely to cause injury when put to the use for which the product was intended."

The instructions in question are not inherently erroneous. *Glasgow v. Pacific Mills,* 109 S. C. 385, 96 S. E. 137; *Matthews v. Payne, Director General,* 121 S. C. 84, 113 S. E. 381; *Prisock v. International Agricultural Corp.,* 147 S. C. 58, 144 S. E. 579; *Davis, Admr. v. Atlantic Coast Line R. Co.,* 150 S. C. 130, 147 S. E. 834. Therefore, assuming that they are subject, when considered alone, to the interpretation that Ford was under an absolute duty to adopt a *safe* plan or design of the gearshift assembly, such interpretation clearly, in my view, becomes untenable in the light of the remainder of the charge. The trial judge, not once but several times in the charge, told the jury that the duty owed by Ford was that of reasonable or ordinary care.

The phrase safe plan or design, contained in instruction No. 5, did not convey the meaning of absolutely safe but, as shown by the charge as a whole, was used in the sense of reasonably safe. Instructions No. 5 and No. 14, when viewed in context, simply informed the jury that Ford had the duty to anticipate that its vehicle might become involved in an emergency use, here a collision, and that in manufacturing its product it had a duty to so design the gearshift assembly as to fairly (reasonably) protect the user.

In addition to the foregoing, the main opinion holds that the trial judge erred in granting plaintiff's request No. 9, but failed to express a view as to whether, standing alone, such would constitute reversibile error. Request No. 9 was as follows:

"A manufacturer of a product who knowingly sells or furnishes an article which, by reason of negligent design, is imminently dangerous to life or body, is liable to any person who suffers injury therefrom if the manufacturer failed to give reasonable notice or warning of the defect or danger."

Ford's exception to the foregoing instruction is "upon the ground that the same is misleadingly incomplete, fails to take into account the obvious characteristics of a product, is incorrect as respects design defects, and does not apply where the defect alleged did not cause the accident producing the injury in the course of the intended use of the object."

This exception should be dismissed because it is too general, vague, and indefinite to be considered. Rule 4, Section 6, of the Rules of this Court.

Certainly it would not be argued that the instructions in this case attained absolute accuracy. The writer does state however, in all confidence, that one sound criticism of the charge is that it was more favorable to Ford than it was entitled to under the law.

The appellant is required to show that it suffered prejudice from the instructions, which it has failed to do. I

respectfully submit that the basis set forth in the main opinion for depriving this plaintiff of a $312,000.00 verdict against Ford is nebulous indeed. The exceptions of Ford to the charge should be overruled.

I would affirm the judgment as to Cherokee, reverse the judgment N. O. V. granted to Ford, deny Ford's alternative motion for a new trial, and affirm the verdicts of the jury against both Cherokee and Ford.

LIONEL K. LEGGE, Acting Associate Justice (dissenting in part):

I cannot escape the conviction that the amount of the verdict in this case is so excessive as to require a new trial.

Where permanent total disability is involved, as it is here, there can of course be no precise measure of compensatory damages. Not all the money in the world can restore vision to a lost eye, or cure the paralysis resulting from an injury such as the record here shows the respondent to have sustained. But it does not follow that one who has been thus permanently disabled by the negligent act of another is entitled to a limitless verdict. For, since money is the only medium of compensation, it seems to me that where the principal element of the injury is physical, as is the case here, full compensation must of necessity be measured, primarily, by such amount of money as will enable the injured person to live his remaining days as happily and comfortably as possible for one in his condition,—in pleasant surroundings, free from financial worry, able to obtain competent medical and nursing care and such other services as may be available and appropriate for his peace of mind and his physical welfare. The measure of damages thus suggested is of necessity inexact; but at least it attempts to relate the physical and financial consequences of permanent injury to the compensative property of money. It does not take into account the other, quite imponderable, elements of pain and of mental anguish that in a proper case are includable in compensatory damages. But in most cases, and certainly in the case pre-

sented by the record here, where the primary and principal element of damage is disability and thus susceptible of measurement in terms of the purchasing power of money, mental anguish and physical suffering should be recognized as secondary elements of damage, and award therefor, if made at all, should be added with due restraint in the light of the principal award.

But why, one may ask, should we attempt to formulate for ourselves any measure of compensatory damages in a case such as the one before us since the law makes the conscience of this court, on appeal the arbiter to determine the issue of excessiveness, and declares that we may not disturb the verdict unless it is so grossly excessive as to convince us, to the extent that it shocks our conscience, that it was motivated by passion, prejudice, sympathy, corruption or other improper considerations? The answer is obvious: without some fair and reasonable guide for the exercise of its conscience, an appellate court may stray into the uncharted field of emotionalism or the shifting sands of individual sensitivity, and thus unwittingly become the tool of sympathy or pity or prejudice rather than the servant of justice.

In addition to the necessity for some rational basis for approximate measurement of compensatory damages in a case of this kind, we should bear in mind certain basic principles that are applicable here. In the first place, it is to the plaintiff's injuries alone that the compensatory verdict must relate; and where it includes prospective damages for permanent total disability, such damages must be reduced to their present cash value, i. e., to a principal sum that will produce a reasonable amount to provide the personal services and care needed by the injured person because of such disability, from the date of the verdict throughout his life expectancy.

"So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking

account of the earning power of the money that is presently to be awarded." *Chesapeake and Ohio Ry. Co. v. Kelly,* 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117.

So we held in *Grimsley v. Atlantic Coast Line R. Co.,* 189 S. C. 251, 1 S. E. (2d) 157. So also the trial judge charged the jury in the case at bar; and such instruction is not challenged here. Corollary to the foregoing principle is recognition of the fact that the plaintiff alone is the beneficiary of such a cause of action, and that to him alone should compensation be directed. And, finally, the verdict is not to be founded upon sympathy for the plaintiff or related to or concerned with the wealth of the defendant.

Two matters apparent in the record here, we dismiss from our consideration as having no significant bearing on the issue of excessiveness. In many cases of permanent disability, total or partial, a more or less tangible element of damage is loss or diminution of earning capacity. That element is absent here; but under the facts of this case its absence is, in our opinion, wholly immaterial. Also, as stated in the leading opinion, the plaintiff married subsequent to the trial and, about two years after the trial, without any ill effects to herself, gave birth to a normal child. It may be argued that this happy circumstance tended to alleviate the plaintiff's mental anguish resulting from her injuries; but, however that may be, we do not take it into account in our scrutiny of the verdict, for the simple reason that it was not within the jury's knowledge or within the scope of its inquiry.

It is to be noted that the verdict was for compensatory damages only, and was in the amount of $780,000.00. That by consent, or least without objection preserved here, the jury saw fit to apportion it between two of the defendants, charging Cherokee with payment of $468,000.00 of it and Ford with payment of $312,000.00, is wholly irrelevant to the issue of its excessiveness. Equally irrelevant to that issue is the trial judge's order granting Ford's motion for judgment n. o. v. For it is to the total amount of compensatory

damages awarded by the jury that we must look in our endeavor to determine the issue of excessiveness.

Consideration of this verdict in the light of the principles hereinabove discussed leads me to conclude that it violates them, and that we should set it aside, for the following reasons:

1. It is grossly excessive in amount, bearing no reasonable relation to the plaintiff's actual damage measurable in terms of money. As pointed out in Cherokee's brief, $780,000.00 invested at six percent would yield an annual income of $46,800.00, a sum more than sufficient to provide the plaintiff each year with all of the necessities and comforts of life, including medical and nursing care, that so far as the record indicates can be purchased in the interest of her physical and material wellbeing. Indeed, $600,000.00 invested at four per cent, which was about the average rate of interest payable on obligations of the government of the United States at the time when the verdict was rendered, would yield annually an income of $24,000.00, an amount that would appear amply sufficient for such purposes even under our presently inflated economy. Nor can we justify a verdict grossly excessive under present economic conditions by assuming that during the years to come our economy may be more inflationary than it is now. Such assumption would be manifestly speculative, *Armentrout v. Virginian Ry. Co.* (D. C. S. D. W. Va. 1947), 72 F. Supp. 997, rev. on other grounds (C. A. 4th), 166 F. (2d) 400, 4 A. L. R. (2d) 1064; *Hodkinson v. Parker* (S. D. 1944), 70 S. D. 272, 16 N. W. (2d) 924.

2. Assuming such reasonable investment of the proceeds of such verdict, the whole principal would remain intact at the time of the plaintiff's death, whether that be at the end of one year or of fifty years, and would thereupon pass by will or descent to a person or persons having no interest in the cause of action that gave rise to the verdict, and for whose benefit the verdict was therefore not intended.

3. Its size convincingly suggests that the verdict was the product of sympathy for the plaintiff and prejudice against the corporate defendants because of their wealth,—a sympathy and a prejudice doubtless engendered, or at least invited, by her counsel's closing argument to the jury, wherein he: appealed to their friendship for the plaintiff; declared that construction companies "have a lot of money" and that he was not trying to "put a lump in anybody's throat", but was trying to "take a lump out of somebody's pocket that can afford it"; declared that there was no alliance between the plaintiff and the defendant Blackmon (who was the driver of the automobile that collided with the one in which the plaintiff was riding, and whose motion for a directed verdict had not been opposed by her counsel), and that the only alliance in the case was that of "the have against the have-nots"; and urged for their consideration that the defendant Ford Motor Company makes "ten million dollars worth of automobiles a day." (It is to be noted here that before sending the case to the jury the trial judge had denied Cherokee's motion for direction of verdict in its favor as to punitive damages, and had granted Ford's similar motion. The foregoing comments on counsel's remarks are therefore made not with regard to their propriety or impropriety in connection with the issue of punitive damages, but solely by way of pointing out the obvious influence of such argument upon the jury's determination of actual damages, the verdict being for such damages alone.)

I find myself unable to agree that the judgment in favor of Ford should be reversed and a new trial ordered as to it. Such holding can be justified only upon the existence of evidence from which it may reasonably be inferred that in designing its 1949 model with a gearshift lever having at its end a white, instead of black, plastic knob, Ford was guilty of negligence endangering the safety of the occupants of the automobile because after thirteen years of use exposed to sunlight the white plastic would be more likely to shatter than a black one upon receiving a sudden violent blow. In

my opinion such inference is without evidentiary support. Rather, as it seems to me, the only reasonable inference from all of the evidence in that regard is that the knob was designed not as "a needed safety device", but simply as a handhold for convenience in shifting gears, and I find nothing in the evidence from which it may reasonably be inferred that in 1949 such design constituted actionable negligence. In my opinion Ford's motion for judgment n. o. v. was properly granted.

I would affirm as to Ford and reverse and remand for a new trial as to Cherokee.